JS 44C/SDNY
REV. 12/2005

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

| PLAINTIFFS KATHLEEN MULLINIX | DEFENDANTS MOUNT SINAI SCHOOL OF MEDICINE |
|---|---|

| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Kaiser Saurborn & Mair, P.C. 111 Broadway, Ste. 1805, NY, NY 10006  212-338-9100 | Proskauer Rose LLP Eleven Times Square, NY, NY 10036   212-969-3065 |

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)

Age Discrimination in Employment Act, 29 U.S.C. §621, et seq., and the Employee Retirement Income Security Act of 1974, 19 U.S.C. §1001, et seq.

Has this or a similar case been previously filed in SDNY at any time? No [X]  Yes? [ ]  Judge Previously Assigned

If yes, was this case Vol.[ ]  Invol. [ ]  Dismissed. No [ ]  Yes [ ]   If yes, give date _____ & Case No. _____

*(PLACE AN [x] IN ONE BOX ONLY)*        NATURE OF SUIT

ACTIONS UNDER STATUTES

**TORTS**

**CONTRACT**
- [ ] 110 INSURANCE
- [ ] 120 MARINE
- [ ] 130 MILLER ACT
- [ ] 140 NEGOTIABLE INSTRUMENT
- [ ] 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
- [ ] 151 MEDICARE ACT
- [ ] 152 RECOVERY OF DEFAULTED STUDENT LOANS (EXCL VETERANS)
- [ ] 153 RECOVERY OF OVERPAYMENT OF VETERANS BENEFITS
- [ ] 160 STOCKHOLDERS SUITS
- [ ] 190 OTHER CONTRACT
- [ ] 195 CONTRACT PRODUCT LIABILITY
- [ ] 196 FRANCHISE

**PERSONAL INJURY**
- [ ] 310 AIRPLANE
- [ ] 315 AIRPLANE PRODUCT LIABILITY
- [ ] 320 ASSAULT, LIBEL & SLANDER
- [ ] 330 FEDERAL EMPLOYERS' LIABILITY
- [ ] 340 MARINE
- [ ] 345 MARINE PRODUCT LIABILITY
- [ ] 350 MOTOR VEHICLE
- [ ] 355 MOTOR VEHICLE PRODUCT LIABILITY
- [ ] 360 OTHER PERSONAL INJURY

**PERSONAL INJURY**
- [ ] 362 PERSONAL INJURY - MED MALPRACTICE
- [ ] 365 PERSONAL INJURY PRODUCT LIABILITY
- [ ] 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**PERSONAL PROPERTY**
- [ ] 370 OTHER FRAUD
- [ ] 371 TRUTH IN LENDING
- [ ] 380 OTHER PERSONAL PROPERTY DAMAGE
- [ ] 385 PROPERTY DAMAGE PRODUCT LIABILITY

**FORFEITURE/PENALTY**
- [ ] 610 AGRICULTURE
- [ ] 620 FOOD & DRUG
- [ ] 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
- [ ] 630 LIQUOR LAWS
- [ ] 640 RR & TRUCK
- [ ] 650 AIRLINE REGS
- [ ] 660 OCCUPATIONAL SAFETY/HEALTH
- [ ] 690 OTHER

**LABOR**
- [ ] 710 FAIR LABOR STANDARDS ACT
- [ ] 720 LABOR/MGMT RELATIONS
- [ ] 730 LABOR/MGMT REPORTING & DISCLOSURE ACT
- [ ] 740 RAILWAY LABOR ACT
- [ ] 790 OTHER LABOR LITIGATION
- [ ] 791 EMPL RET INC SECURITY ACT

**BANKRUPTCY**
- [ ] 422 APPEAL 28 USC 158
- [ ] 423 WITHDRAWAL 28 USC 157

**PROPERTY RIGHTS**
- [ ] 820 COPYRIGHTS
- [ ] 830 PATENT
- [ ] 840 TRADEMARK

**SOCIAL SECURITY**
- [ ] 861 MIA (1395FF)
- [ ] 862 BLACK LUNG (923)
- [ ] 863 DIWC (405(g))
- [ ] 863 DIWW (405(g))
- [ ] 864 SSID TITLE XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 TAXES
- [ ] 871 IRS-THIRD PARTY 20 USC 7609

**OTHER STATUTES**
- [ ] 400 STATE REAPPORTIONMENT
- [ ] 410 ANTITRUST
- [ ] 430 BANKS & BANKING
- [ ] 450 COMMERCE/ICC RATES/ETC
- [ ] 460 DEPORTATION
- [ ] 470 RACKETEER INFLUENCED & CORRUPT ORGANIZATION ACT (RICO)
- [ ] 480 CONSUMER CREDIT
- [ ] 490 CABLE/SATELLITE TV
- [ ] 810 SELECTIVE SERVICE
- [ ] 850 SECURITIES/ COMMODITIES/ EXCHANGE
- [ ] 875 CUSTOMER CHALLENGE 12 USC 3410
- [ ] 891 AGRICULTURE ACTS
- [ ] 892 ECONOMIC STABILIZATION ACT
- [ ] 893 ENVIRONMENTAL MATTERS
- [ ] 894 ENERGY ALLOCATION ACT
- [ ] 895 FREEDOM OF INFORMATION ACT
- [ ] 900 APPEAL OF FEE DETERMINATION UNDER EQUAL ACCESS TO JUSTICE
- [ ] 950 CONSTITUTIONALITY OF STATE STATUTES
- [ ] 890 OTHER STATUTORY ACTIONS

**REAL PROPERTY**
- [ ] 210 LAND CONDEMNATION
- [ ] 220 FORECLOSURE
- [ ] 230 RENT LEASE & EJECTMENT
- [ ] 240 TORTS TO LAND
- [ ] 245 TORT PRODUCT LIABILITY
- [ ] 290 ALL OTHER REAL PROPERTY

**ACTIONS UNDER STATUTES**

**CIVIL RIGHTS**
- [ ] 441 VOTING
- [x] 442 EMPLOYMENT
- [ ] 443 HOUSING ACCOMMODATIONS
- [ ] 444 WELFARE
- [ ] 445 AMERICANS WITH DISABILITIES - EMPLOYMENT
- [ ] 446 AMERICANS WITH DISABILITIES -OTHER
- [ ] 440 OTHER CIVIL RIGHTS

**PRISONER PETITIONS**
- [ ] 510 MOTIONS TO VACATE SENTENCE 20 USC 2255
- [ ] 530 HABEAS CORPUS
- [ ] 535 DEATH PENALTY
- [ ] 540 MANDAMUS & OTHER
- [ ] 550 CIVIL RIGHTS
- [ ] 555 PRISON CONDITION

*Check if demanded in complaint:*

CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____  OTHER _____

*Check YES only if demanded in complaint*
JURY DEMAND: [X] YES  [ ] NO

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.? IF SO, STATE:

JUDGE _____  DOCKET NUMBER _____

NOTE:  Please submit at the time of filing an explanation of why cases are deemed related.

(SEE REVERSE)

*(PLACE AN  x  IN ONE BOX ONLY)* **ORIGIN**

☒ 1 Original
Proceeding

☐ 2a. Removed from
State Court
☐ 2b. Removed from State Court
**AND at least one party is a pro se litigant**

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
(Specify District)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate Judge
Judgment

*(PLACE AN  x  IN ONE BOX ONLY)* **BASIS OF JURISDICTION** *IF DIVERSITY, INDICATE CITIZENSHIP BELOW. (28 USC 1332, 1441)*

☐ 1 U.S. PLAINTIFF    ☐ 2 U.S. DEFENDANT    ☒ 3 FEDERAL QUESTION
(U.S. NOT A PARTY)    ☐ 4 DIVERSITY

**CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)**

(Place an [X] in one box for Plaintiff and one box for Defendant)

| | PTF DEF | | PTF DEF | | PTF DEF |
|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1 [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3 [ ] 3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5 [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2 [ ] 2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4 [ ] 4 | FOREIGN NATION | [ ] 6 [ ] 6 |

**PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)**

Kathleen Mullinix
1050 Fifth Avenue
New York, New York 10028
New York County

**DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)**

MOUNT SINAI SCHOOL OF MEDICINE
One Gustave L. Levy Place
New York, NY 10029-6574
New York County

**DEFENDANT(S) ADDRESS UNKNOWN**
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:    THIS ACTION SHOULD BE ASSIGNED TO:    ☐ WHITE PLAINS    ☒ FOLEY SQUARE
(DO NOT check either box if this a PRISONER PETITION.)

| DATE | SIGNATURE OF ATTORNEY OF RECORD | ADMITTED TO PRACTICE IN THIS DISTRICT |
|---|---|---|
| 11/28/2012 | | [ ] NO |
| RECEIPT # | | [x] YES (DATE ADMITTED Mo. 05    Yr. 1992 ) |
| | | Attorney Bar Code # DM--8883 |

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

J Michael McMahon, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

KATHLEEN MULLINIX

_____
*Plaintiff*

v.

MOUNT SINAI SCHOOL OF MEDICINE

_____
*Defendant*

)
)
)
)
)
)
)

**12 CIV 8659**

Civil Action No.

**JUDGE CASTEL**

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   MOUNT SINAI SCHOOL OF MEDICINE
One Gustave L. Levy Place
New York, NY 10029-6574

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Kaiser Saurborn & Mair, P.C.
111 Broadway, Suite 1805
New York, NY 10006

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

RUBY J. KRAJICK

*CLERK OF COURT*

Date: NOV 2 9 2012  _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $      0.00      .

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                              *Server's signature*

                                         _____
                                              *Printed name and title*

                                         _____
                                              *Server's address*

Additional information regarding attempted service, etc:

**JUDGE CASTEL**

David N. Mair [DM-8883]
KAISER SAURBORN & MAIR, P.C.
111 Broadway, 18th Floor
New York, New York 10006
(212) 338-9100

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
KATHLEEN MULLINIX

                                Plaintiff,

        -against-                                          **COMPLAINT**

MOUNT SINAI SCHOOL OF MEDICINE,
                                                           (Jury Trial Demanded)
                                Defendant.
-----------------------------------------------------------x

        Plaintiff, Kathleen Mullinix, by her attorneys Kaiser Saurborn & Mair, P.C., as and for

her complaint against defendant, alleges as follows:

## PARTIES AND VENUE

        1.      Plaintiff, Kathleen Mullinix, is a resident of the County, City and State of New

York.

        2.      Defendant Mount Sinai School of Medicine is a medical school located in, and

operating primarily within, the County, City and State of New York.

        3.      The Court has jurisdiction over this action Pursuant to 28 U.S.C. § 1331, in that

one of the claims asserted herein arises under the Age Discrimination in Employment Act, 29

U.S.C. § 621 et seq., and the Employee Retirement Income Security Act of 1974 ("ERISA"), 19

U.S.C. § 1001 *et seq.*

4.      Venue is properly laid in this District pursuant to 28 U.S.C. § 1391, in that it is the District in which the defendants reside and the District in which a substantial portion of the events giving rise to the claims asserted herein occurred.

## INTRODUCTION

5.      Mullinix, who is currently 68 years of age, was the Director of the Office of Technology and Business Development ("OTBD") at defendant, Mount Sinai School of Medicine ("Mount Sinai") until she was removed from her position in March 2012.  Her removal, together with the refusal by Mount Sinai's Dean to seriously consider her for a promotion for which he conceded she was a very strong candidate, were undertaken as part of the Dean's stated goal of bringing a "more youthful" approach at the OTBD.

6.      This action seeks to recover damages under federal, New York State and New York City age-discrimination laws because Mount Sinai: (a) refused to promote Mullinix to the position of Vice President of Technology and Business Development because of her age; and (b) removed Mullinix from her position as Director in March 2012 – and subsequently terminated her employment in July 2012 – because of her age.

7.      This action also seeks to recover damages for Mount Sinai's unlawful retroactive termination of Mullinix's health insurance in violation of New York Labor Law, §§ 195(6) and 217(7)(b), and ERISA.

## FACTS GIVING RISE TO PLAINTIFF'S CLAIMS

**A.      Mullinix's Background Prior to Mount Sinai**

8.      Mullinix holds a Ph.D. in Chemical Biology from Columbia University and has had a long and distinguished career as a leader in the field of identification and

2

commercialization of scientific discoveries in the bio-medical sciences. As a result of her scientific training and business expertise she has had outstanding success in the translation of basic scientific discoveries into valuable products that have brought major improvements to the public health field.

9.      Prior to being hired at Mount Sinai, Mullinix had held senior leadership roles in the public sector, as Assistant Director of the National Institutes of Health, in the private sector, as President, Chief Executive Officer and founder of Synaptic Pharmaceutical Corporation ("Synaptic"), and in academia, as Vice Provost of Columbia University.

10.      At Columbia University Mullinix established and built the technology transfer office and negotiated license agreements between Columbia and pharmaceutical and device companies that have yielded $2 billion in revenues.

11.      As founder and CEO of Synaptic, Mullinix successfully led the company's transformation from a start-up to a public company that was a leader in its field. Mullinix also developed the scientific and business strategies that yielded Synaptic a patent estate of over 200 patents and multiple collaboration and license agreements with major pharmaceutical companies. She also negotiated all of the company's collaboration and licensing agreements, led all of the private venture capital financing rounds and ultimately led the company's IPO and follow-on offerings in the public equity markets.

**B.      Mount Sinai's Appointment of Mullinix to Head its OTBD**

12.      In October 2009 Mullinix was hired as Mount Sinai's Associate Director for Business Development by Patrick McGrath, the then-head of its Office of Technology and Business Development ("OTBD"). She initially was responsible for identifying and pursuing

3

opportunities for enhanced collaborations between Mount Sinai scientists and pharmaceutical companies and, within a short period of time, also became closely involved with licensing deals as an advisor on both patent prosecution strategies and a variety of major transactions.

13.     In the beginning of July, 2010, Mount Sinai's Dean, Dennis Charney, met with Mullinix and told her he had decided to remove McGrath as head of OTBD.  Charney offered Mullinix the position of "Interim" Director of the office.

14.     Mullinix told Charney she would be interested in the position of Director of the office, but only if she were hired as the permanent Director rather than an interim Director.  Dean Charney agreed to do so and Mullinix took over the Director position in July 2010.

15.     However, as set forth in more detail below, it later became apparent that while Dean Charney needed Mullinix to "re-start" (or turn around) the OTBD, he considered her to be too old to head the office permanently.  Thus, unbeknownst to Mullinix, although Dean Charney agreed to give her the title of Director without the qualifying term "Interim", he always intended that Mullinix's tenure in the position would be limited to the minimum period necessary to turn the office around, at which point he would replace her on a permanent basis with a younger person.

16.     Mount Sinai's Executive Vice President, Jeffrey Silberstein, was delegated by Charney to negotiate the details of her employment.  At Mullinix's insistence, Silberstein agreed to give her a two-year employment contract with a term ending in July 2012.  Her employment contract was signed in October 2010.

**C.**    **Dean Charney's Refusal to Consider Mullinix for the Vice President Position Because of her Age**

17.    During McGrath's tenure heading OTBD he reported directly to Dean Charney. However, at the time Charney appointed Mullinix as Director of OTBD, Charney informed her that Mount Sinai had decided to create a new "Vice President of Technology and Business Development" position that would oversee the OTBD and report to Dean Charney.  Upon filling the new Vice President position, the Director of OTBD would then report to the Vice President instead of to Dean Charney.

18.    At that time of her appointment as Director, Mullinix expressly told Charney that she wanted to be a candidate for the new Vice President position he had described.  Charney assured her that she was a "very strong" candidate for the Vice President position but that a formal search process would nevertheless have to be undertaken before a decision was made.

19.    Mullinix's employment contract for the Director position, executed three months later, confirmed that she "will be a candidate for [the Vice President] position."

20.    Indeed, with extensive experience in basic science, academic technology transfer and senior business leadership roles in life-science-based businesses, Mullinix was highly – arguably uniquely – qualified for the Vice President position.

21.    However, as set forth below, as the search process unfolded it became painfully apparent that Charney had no intention of genuinely considering Mullinix on the merits for the Vice President position because she did not meet his own, overriding age-biased criterion of bringing "a more youthful approach" to the OTBD.

22.    In November 2010, Mullinix was contacted by Sean McCooe, whose executive

5

search firm had been retained by Charney to conduct the Vice President search.  McCooe

scheduled a meeting with Mullinix but at the meeting he made it clear that he was not interested

in discussing Mullinix or her credentials.

23.     Mullinix heard nothing further regarding the search until she asked Dean Charney

about the status of her candidacy and the search process during one of their regular weekly

meetings during the second half of December 2010.  Charney responded by stating that he did not

think she wanted to be a candidate for the position.  Mullinix was stunned by Charney's false

statement, which directly contradicted his previous statement that she was a "very strong

candidate" for the position and the confirmation of her candidacy memorialized in her

employment contract that had been signed a mere two months earlier.  She told Charney she did

not know how he had gained such an impression and reiterated that she had always understood

she was a strong candidate for the position and was very interested in pursuing it.

24.     Charney therefore had no option but to at least go through the motions of

including Mullinix in the formal search process.

25.     On Charney's instructions, McCooe again contacted Mullinix and scheduled

another interview.  Unlike the previous meeting with McCooe – which he had conducted in a

coffee shop – he held this meeting at the Yale Club with at least the trappings of a genuine

interview.  However, McCooe again gave the impression that her candidacy was not being taken

seriously and she repeatedly had to try to refocus the discussion on her qualifications for the

position.

26.     At the end of the interview McCooe asked Mullinix to provide the names of her

references and a few days later she sent him a list of four references.  She later discovered that

6

neither McCooe nor anyone else involved in the search process ever contacted a single one of them.

27.     Charney had established a Search Committee, ostensibly to make recommendations to him on the candidates for the Vice President position.

28.     On January 20 and 21, 2011, Mullinix was interviewed by all four members of the Search Committee.  One member of the search committee, Mount Sinai's President, Kenneth Davis, told her that he considered her to be a "very strong candidate."

29.     Another member of the search committee was Dr. Roger Hajjar, Professor of Cardiology and the Research Director of Mount Sinai's Wiener Family Cardiovascular Research Laboratories, with whom Mullinix had already worked on several projects while at OTBD. Hajjar commended her on her work and told her at the end of the interview "you certainly have my vote."

30.     Mullinix's final interview was with Dean Charney himself, who told her that he thought it was "silly" for him to interview her given that she worked for him already and they met regularly.  Mullinix repeatedly tried to discuss her accomplishments and visions for the future of OTBD but Dr. Charney displayed no interest in discussing these highly relevant topics.

31.     During February and March 2011 Mullinix learned that Dean Charney favored hiring an external candidate, Teri Willey, as the Vice President.  Willey is approximately 15 years younger than Mullinix.

32.     Charney's preference for Willey, rather than Mullinix, cannot be explained by any legitimate consideration because Willey lacked one of only two essential experience requirements specified in the position description developed for the Vice President search.

7

Specifically, whereas the position description indicated that Mount Sinai was seeking a candidate with "15+ year's business experience, including personal participation with the leadership of one or more life-science-based businesses," upon information and belief Willey had never held a senior business leadership position with operational responsibilities.  Rather, Willey's experience was almost entirely in university technology transfer positions.  Mullinix, on the other hand, in addition to developing Columbia University's technology transfer office, had founded and led for 15 years a life-science based biotechnology company from its inception to become a public emerging pharmaceutical company with over 150 employees – in other words, precisely the credential that Mount Sinai purported to be looking for in filling the VP position.

33.    Moreover, Willey lacked the scientific training and expertise required to recognize and develop the assets that arise from academic research in the field of biomedical science. Mullinix, on the other hand, has a demonstrated record of successfully developing strategies for securing intellectual property rights for inventions in biotechnology platform technologies, methods of use and treatment, biological materials, biological and chemical therapeutants, and know-how that have collectively yielded billions of dollars to the patent owners.  The ability to develop assets that arise from the biomedical research that is conducted at Mount Sinai requires an understanding of the discoveries themselves in order to understand their commercial potential. Willey herself has publically admitted on multiple occasions while at Mount Sinai that she does not "understand or get involved with" the science of the scientific discoveries that are commercialized by OTBD.

34.    Charney's motivation in initially trying to exclude Mullinix from consideration for the Vice President position, and thereafter refusing to take her candidacy seriously despite her

8

superior background and abilities, became apparent at a Dean's Leadership Board Meeting that Mullinix attended in or around March 2011.  At that meeting, Dean Charney discussed the Vice President search and stated in front of the entire Board that he wanted to bring a "more youthful" approach to the OTBD office.

35.     McGrath was approximately 62 years old at the time the Dean removed him as head of OTBD and Mullinix was 67 years old at the time of the Vice President search.  By contrast, upon information and belief Willey was in her early fifties.

36.     Charney's statement at the Leadership Board Meeting, witnessed by approximately 50 people, constituted a startlingly frank admission of his age bias in filling the senior leadership positions at the OTBD.

37.     In early April, having heard no official word on how the search process was progressing, Mullinix called Dr. Hajjar (one of the search committee members) to enquire as to the status of the search.  Dr. Hajjar told her he knew nothing of the status of the search and considered the process to have been handled very strangely by Dean Charney. He said that the usual procedure for a search committee was for the participants to meet separately with each candidate and then collectively discuss the candidates and their recommendations with the Dean. In this case, however, the committee had interviewed three candidates but Dean Charney had never convened a meeting to discuss the candidates.  As Dr. Hajjar put it to Mullinix: "maybe he [the Dean] already knew what he wanted."

38.     Shortly after her conversation with Hajjar, Charney informed Mullinix that he had decided to hire Ms. Willey for the Vice President position.  He refused to provide any insight into why he had selected Ms. Willey.

9

39.     Neither Charney nor McCooe ever bothered to contact the references provided by Mullinix as part of the search process.  When Mullinix questioned McCooe as to why he never bothered to check the references he had asked her to provide, McCooe initially falsely claimed that he had spoken to one of her references, Jack Granowitz, the retired Executive Director of Columbia's technology transfer office.  However, when Granowitz yet again confirmed to Mullinix that he had never been contacted by, or spoken to, McCooe or anyone else regarding the search, McCooe changed his story and instead claimed it had not been necessary to contact her references because Mount Sinai had decided very early in the process that they wanted Willey instead of her.

40.     Willey's selection as Vice President was publicly announced on May 19, 2011.

41.     Willey was selected for the Vice President position instead of Mullinix because Willey was 15 years younger than Mullinix – then age 67 – who was considered by Charney to be too old to lead the OTBD for more than the minimum period necessary to turn it back in the right direction.

42.     Indeed, the recent removal of Mullinix from the Director position, despite her undisputed record of accomplishment in leading and turning the office around, now conclusively confirms that Dean Charney did not want a person of her age in the senior technology-transfer leadership position any longer than was absolutely necessary.

**D.**     **Mullinix's Exceptional Performance in her Role as Director of OTBD**

43.     Ms. Willey recognized Mullinix's exceptional performance in the position of Director as recently as December 2011, when Willey submitted a memorandum reviewing and praising her performance in support of awarding Mullinix's full 2011 bonus.  Willey's

memorandum "recognize[d] the critical contributions" made by Dr Mullinix after she was

appointed to head the OTBD office and "initiate a re-start of the [OTBD] program."  Amongst

other praise in the memorandum, Willey: (a) described in glowing terms many of Mullinix's

accomplishments as Director, including the "transforming role" played by "a talented and highly

successful professional" hired by Mullinix; (b) commended Mullinix for "design[ing] and

develop[ing] a new paradigm for the operations of OTBD that will support the goals of OTBD to

create maximal value from the scientific discoveries of [Mount Sinai]'s staff"; (c) praised

Mullinix for implementing programs that resulted in "significant cost savings in 2011" and

uncovering and collecting "significant income owed to, but not collected by, [MOUNT SINAI] ...

far exceeding $3 million for 2010 and 2011"; (d) praised Mullinix for her "leadership in the

office which has been critical"; (e) emphasized that "[al]though many of her contributions have

been about bringing operations in line, [Mullinix] is very strong strategically and continues to be

intuitive in identifying critical opportunities for the benefit of [MOUNT SINAI]"; (f) praised

Mullinix for her innovation in establishing Blue Mountain Technologies, an internal start-up

business designed to bring Mount Sinai's portfolio of devices and molecular diagnostic reagents

to market through commercial partnerships with third parties; (g) praised Mullinix for

"successfully [leading] the OTBD component of a litigation that was of great significance to

[MOUNT SINAI]," including personally "design[ing] the financial model for a data-driven

analysis of the valuation of the asset [and] identif[ying] the scientific basis of critical arguments

and [driving] appropriate parties to effect the necessary scientific work"; and (h) praised Mullinix

for "negotiat[ing] a research collaboration agreement with a major pharmaceutical company

[which] [n]ot only ... provid[ed] very significant research support but also ... contain[ed] novel

11

provisions of high potential value that have not heretofore been embodied in any other agreement to which the institution is a party."

44.     Willey also expressly acknowledged in her December 2011 memorandum that "Dr Mullinix has facilitated [Ms. Willey's] arrival in a way that has been very positive, helpful and appreciated even more so as she was an applicant for the VP role as well."

45.     Mullinix's employment contract required her to initiate renewal discussions with Mount Sinai approximately six months before the end of her employment contract.  In early January 2012, in response to the initiation of such discussions by Mullinix, Willey told Mullinix that she was recommending to Dean Charney that the contract be renewed for an additional two years when the original term ended in July 2012.

**E.     Mount Sinai's Removal of Mullinix from Her Position Based on Dean Charney's Original Biased Belief That She Was Too Old to Fill the Position Permanently**

46.     Against this backdrop of having orchestrated and led a highly successful turnaround of the OTBD, and Willey's confirmation in January that she was recommending a two-year contract extension, Willey abruptly told Mullinix on March 8, 2012 – with no prior warning – that her duties as Director would be removed immediately and her contract would not be renewed when it reached the end of its initial term in July 2012.

47.     Willey was unable to even articulate a plausible reason for Mullinix's removal. Instead, Willey vaguely asserted that Mullinix was "not faculty friendly" and when, challenged by Mullinix to provide specifics, came up with only one concrete example.  Incredibly, however, the example Willey provided involved the same research collaboration agreement for which Ms. Willey had highly praised Mullinix in the December 2011 memorandum (quoted in paragraph

41(h) above) in which Mullinix had obtained for the first time in Mount Sinai's history a research contract provision entitling it to be paid for "know-how" in addition to patented inventions resulting from the research.

48.    Moreover, the only alleged complaint about Mullinix cited by Willey was made nine months earlier – during the Summer of 2011 – by a faculty member, Peter Palese, who is notorious for being both difficult to deal with and a bully to others at Mount Sinai.  Indeed, Dean Charney himself frequently referred to Palese as a "pain in the ass" in discussions with Mullinix and others.

49.    In sum, Willey's purported explanation for Mullinix's removal and termination – which involved an alleged complaint made back in the Summer of 2011 – was utterly belied by Willey's glowing written review of her performance a mere three months earlier in December 2011 (including her glowing praise for Mullinix's handling of the transaction at issue) and Willey's own decision in January 2012 to recommend that Mullinix's contract be renewed for an additional two years.

50.    The real reason for Wiley's abrupt about-face was that Dean Charney decided it was time to implement his original vision of a "more youthful" approach at OTBD now that Mullinix had fulfilled the purpose for which he had hired her.

51.    Willey later admitted to Mullinix in a March 28, 2012 meeting that Willey had been "told" (apparently by Dean Charney) when she first arrived the previous summer that she should remove Mullinix, presumably because Mullinix had already "served her purpose" and righted the ship.

52.    Mullinix was stripped of her duties as Director of OTBD in March 2012, and her

employment was thereafter terminated in July 2012 following the end of her contract term, because of her age.

53.     On August 31, 2012, Mullinix filed a Charge of Discrimination with the Equal Employment Opportunities Commission ("EEOC") alleging that Mount Sinai had: (a) refused to promote her to the position of Vice President of Technology and Business Development because of her age; and (b) removed her from her position as Director in March 2012 – and subsequently terminated her employment in July 2012 – because of her age.

54.     The foregoing actions of Mount Sinai in discriminating against Mullinix because of her age were willful and wanton.

**F.     Mount Sinai's Contractual Obligation to Pay Severance to Mullinix**

55.     Pursuant to the terms of Mullinix's employment contract with Mount Sinai, in the event Mount Sinai removed Mullinix from her position as Director without cause during the term of her contract, it was obligated to pay her six months' of total compensation and continue her health benefits for a six month period.

56.     Mount Sinai removed Mullinix from her position as Director without cause in March 2012.

57.     Willey initially told Mullinix that she would retain her "Director" title through the end of her contract but would be stripped of her direct reports and other duties as director. However, when Mullinix objected to this disingenuous and transparent attempt to avoid paying her the contractual severance she was owed if she was removed as Director before the end of her term, Mount Sinai backed down and acknowledged that she is entitled to such severance payments.

58.     Notwithstanding the foregoing, Mount Sinai discontinued paying Mullinix's salary with effect from July 31, 2012.

**G.      Mount Sinai's Unlawful Retroactive Termination of Mullinix's Health Insurance**

59.     Mount Sinai continued paying Mullinix in accordance with its regular payroll procedures through July 31, 2012 and continued making deductions from her paycheck through that date for her employee contributions to Mount Sinai's health insurance plans.

60.     As of late September 2012, Mullinix's health insurance with United Healthcare, Mount Sinai's employer-sponsored plan, remained active.

61.     During the period following the termination of Mullinix's employment at Mount Sinai through late September 2012, United Healthcare continued to provide in-network services and reimburse certain out-of-network claims submitted by Mullinix.  During this period Mullinix relied upon this health insurance being in place to undergo certain procedures and treatments, some of which have yet to be reimbursed.

62.     At no time prior to October 2012 did Mount Sinai or its agents notify Mullinix that her health insurance would be terminated.

63.     In early October 2012, Mullinix received for the first time a notification from ADP COBRA services ("ADP"), the company with which Mount Sinai contracts to fulfill certain of its duties under its health insurance plan, that her health insurance had been terminated. Moreover, the ADP notification informed her that the insurance had purportedly been terminated retroactively with effect from April 30, 2012.

64.     In a telephone conversation with Mullinix on October 3, 2012, United Healthcare confirmed the purported retroactive termination of her coverage and indicated that it was done as

a result of actions by Mount Sinai.

65.     The purported retroactive termination of coverage as of April 30, 2012 was also confirmed when Mullinix logged into her account on the United Healthcare website.

66.     Mullinix made an online election for COBRA coverage on October 9, 2012 but was informed by an ADP representative that her health insurance would not be reinstated unless or until she paid thousands of dollars retroactively for the period going back to May 1, 2012.

67.     Ultimately, after repeated demands by Mullinix and her counsel to have her COBRA coverage reinstated, she was able to do so only after she paid retroactively for a portion of the period during which Mount Sinai had originally provided her coverage.

68.     Mount Sinai retroactively terminated Mullinix's health insurance in retaliation for Dr. Mullinix's assertion of age discrimination claims and her filing of a charge of discrimination with the EEOC.

### FIRST CAUSE OF ACTION
(Age Discrimination in Employment Act)

69.     Pursuant to Fed. R. Civ. P. 10(c), plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "68" as if repeated and incorporated herein.

70.     By reason thereof, defendant has violated the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq., and has thereby caused plaintiff to suffer damages, including but not limited to economic injuries, lost employment opportunities and emotional injuries.

### SECOND CAUSE OF ACTION
(NYC Human Rights Law)

71.     Pursuant to Fed. R. Civ. P. 10(c), plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "68" as if repeated and incorporated herein.

16

72.     By reason thereof, defendant has violated New York City Administrative Code §§ 8-107 et seq., and has thereby caused plaintiff to suffer damages, including but not limited to economic injuries, lost employment opportunities and emotional injuries.

### THIRD CAUSE OF ACTION
(NYS Human Rights Law)

73.     Pursuant to Fed. R. Civ. P. 10(c), plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "68" as if repeated and incorporated herein.

74.     By reason thereof, defendant has violated New York Executive Law § 296 and has thereby caused plaintiff to suffer damages, including but not limited to economic injuries, lost employment opportunities and emotional injuries.

### FOURTH CAUSE OF ACTION
(New York Labor Law)

75.     Pursuant to Fed. R. Civ. P. 10(c), plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "68" as if repeated and incorporated herein.

76.     Pursuant to New York Labor Law, §§ 195(6) and 217(7)(b), Mount Sinai was obligated to notify Dr. Mullinix of "the exact date of cancellation" of her health insurance benefits within five working days of the date of termination.

77.     Mount Sinai's actions in retroactively terminating Dr. Mullinix's health insurance violated New York Labor Law, §§ 195(6) and 217(7)(b).

78.     Mount Sinai's actions here are even more egregious given that for May, June and July Dr. Mullinix already paid a portion of her health insurance through payroll deductions and Mount Sinai was contractually required to pay the remaining portion and provide that health insurance.

79.     By reason thereof, Mount Sinai is liable for all costs and expenses (including attorneys fees) incurred by Mullinix as a result of Mount Sinai's violations in an amount to be determined at trial but not less than $10,000.

**FIFTH CAUSE OF ACTION**
(COBRA)

80.     Pursuant to Fed. R. Civ. P. 10(c), plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "68" as if repeated and incorporated herein.

81.     Upon information and belief, Mount Sinai is both the Plan Administrator and the Sponsor of the health insurance plan it offers its employees.

82.     By reason of the foregoing, Mount Sinai has violated the Comprehensive Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. § 1161 *et seq.*, and the Employee Retirement Income Security Act of 1974 ("ERISA"), 19 U.S.C. § 1001 *et seq.* and is liable in damages for an amount to be determined at trial, but not less than $15,000.

**SIXTH CAUSE OF ACTION**
(Breach of Contract)

83.     Pursuant to Fed. R. Civ. P. 10(c), plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "68" as if repeated and incorporated herein.

84.     By reason thereof, Mount Sinai has breached Mullinix's employment contract and is liable in damages for an amount to be determined at trial, but not less than $60,000.

**WHEREFORE**, plaintiff hereby demands judgment against defendant as follows:

(i)     On her first cause of action, awarding actual damages in an amount to be determined at trial but not less than $2 million and punitive damages in an amount to be determined at trial but not less than an additional $2 million;

18

(ii)     On her second cause of action, awarding damages in an amount to be determined at trial but not less than $2 million;

(iii)     On her third cause of action, awarding actual damages in an amount to be determined at trial but not less than $2 million and punitive damages in an amount to be determined at trial but not less than an additional $2 million;

(iv)     On her fourth cause of action, awarding damages in an amount to be determined at trial but not less than $10,000;

(v)     On her fifth cause of action, awarding damages and civil penalties in an amount to be determined at trial but not less than $15,000;

(vi)     On her sifth cause of action, awarding damages in an amount to be determined at trial but not less than $60,000;

(vii)     Awarding plaintiff the costs and disbursements of this action;

(viii)     Awarding plaintiff interest on the foregoing amounts;

(ix)     Awarding plaintiffs statutory attorneys fees pursuant to New York City Administrative Code § 8-502, 29 U.S.C. § 626(b) and 29 U.S.C. § 1132(g); and

(x)     For such further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38, plaintiff hereby demands a trial by jury.

Dated: New York, New York
       November 27, 2012

                              KAISER SAURBORN & MAIR, P.C.
                              Attorneys for plaintiff


            By:      _____
                              David N. Mair [DM-8883]
                              111 Broadway
                              New York, New York 10006
                              (212) 338-9100