PROSKAUER ROSE LLP
Bettina B. Plevan, Esq.
Harris M. Mufson, Esq.
Eleven Times Square
New York, New York 10036
Telephone: 212.969.3065
Facsimile: 212.969.2900
bplevan@proskauer.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

KATHLEEN MULLINIX

Plaintiff,

-against-

MOUNT SINAI SCHOOL OF MEDICINE,

Defendant.

------------------------------------------------------------ x

12 Civ. 8659 (PKC)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**


Page

TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 1

STATEMENT OF UNDISPUTED FACTS ..... 2

Mount Sinai Hires Mullinix At Age 65 ..... 2

Charney Promotes Mullinix To OTBD Director At Age 66 ..... 2

Charney Develops Concerns About Mullinix's Interpersonal Skills ..... 4

Mount Sinai Conducts A Search For The VP, OTBD Position ..... 4

Mount Sinai Considers Mullinix For The VP, OTBD Position ..... 5

Mount Sinai Hires Teri Willey As The VP, OTBD ..... 5

Willey Recognizes Mullinix's Performance Deficiencies ..... 7

Willey Decides Not To Renew Mullinix's Contract ..... 10

ARGUMENT ..... 11

I. THE COURT SHOULD DISMISS MULLINIX'S AGE DISCRIMINATION CLAIMS ..... 11

A. Mullinix Cannot Establish that Mount Sinai's Decision To Hire Willey Was Discriminatory ..... 13

*i.* *Mount Sinai Hired Willey Because of Her Exceptional Credentials* ..... 14

*ii.* *Charney's Alleged Statement Is Not Sufficient To Establish Mullinix's Burden of Showing That She Was Not Promoted Because Of Her Age* ..... 17

B. There Is No Evidence That Willey's Decision Not To Renew Mullinx's Contract Was Motivated by Discrimination ..... 20

i. *Willey's Bonus Memorandum Does Not Establish That Willey's Decision Was Discriminatory* ..... 20

ii. *Mullinix's Speculation That Charney Decided Not To Renew Her Contract Should Be Rejected* ..... 21

II. MULLINIX'S BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED ..... 23

A. Mullinix's Employment Was Not Terminated During the Initial Term ..... 23

B. Mullinix Failed To Sign A Release Agreement ..... 24

CONCLUSION ..... 25

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Baguer v. Spanish Broad. Sys., Inc.*,
No. 04 Civ. 8393 (RJS), 2010 WL 2813632
(S.D.N.Y. July 12, 2010) (Sullivan, J.), *aff'd*,
423 F. App'x 102 (2d Cir. 2011) .......... 19

*Bennett v. Health Mgmt. Sys. Inc.*,
92 A.D.3d 29 (1st Dep't 2011), *leave to appeal denied*,
18 N.Y.3d 811 (2012) .......... 12

*Bennett v. Watson Wyatt & Co.*,
136 F. Supp. 2d 236 (S.D.N.Y. 2001) (Scheindlin, J.), *aff'd*,
51 F. App'x 55 (2d Cir. 2002) .......... 12-13

*Brown v. City of New York*,
No. 10 Civ. 3104 (PKC), 2011 U.S. Dist. LEXIS 137880
(S.D.N.Y. Nov. 30, 2011) (Castel, J.) .......... 13, 18, 19

*Bruder v. Jewish Bd. of Family & Children's Servs.*,
No. 10-CV-5951 (MKB), 2013 WL 789231 (E.D.N.Y. Mar. 4, 2013) (Brodie, J.) .......... 18, 19

*Byrnie v. Town of Cromwell Bd. of Educ.*,
243 F.3d 93 (2d Cir. 2001) .......... 13, 14

*First Investors Corp. v. Liberty Mut. Ins. Co.*,
152 F.3d 162 (2d Cir. 1998) .......... 23

*Forrest v. Jewish Guild for the Blind*,
3 N.Y.3d 295, 305 (2004) .......... 12

*Gannon v. UPS*,
No. 12-3556-CV, 2013 U.S. App. LEXIS 14319 (2d. Cir. July 16, 2013) .......... 12

*Garcia v. Henry St. Settlement*,
501 F. Supp. 2d 531 (S.D.N.Y. 2007) (Sweet, J.) .......... 19

*Goenaga v. March of Dimes Birth Defects Found.*,
51 F.3d 14 (2d Cir. 1995) .......... 13

*Graves v. Deutsche Bank Securities, Inc.*,
No. 07 Civ. 5471 (BSJ) (KNF), 2012 WL 6097712
(S.D.N.Y. Nov. 30, 2012) (Jones, J.), *aff'd*,
No. 12-5082-CV, 2013 WL 6246358 (2d Cir. Dec. 4, 2013) .......... 17, 18

*Gross v. FBL Fin. Servs.*,
557 U.S. 167 (2009) ....... 12

*Jantz v. Emblem Health*,
No. 10-cv-6076 (PKC), 2012 WL 370297 (S.D.N.Y. Feb. 6, 2012) (Castel, J.) ....... 22

*Jones v. N.Y. City Bd. of Educ.*,
No. 09 Civ. 4815, 2012 WL 1116906 (S.D.N.Y. Apr. 2, 2012) (Sweet, J.) ....... 17-18

*Kaul v. Hanover Direct, Inc.*,
148 F. App'x 7 (2d Cir. 2005) ....... 24

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) ....... 11, 12

*McPherson v. NYP Holdings, Inc.*,
No. 03-cv-4517 (NGG) (LB), 2005 WL 2129172
(E.D.N.Y. Sept. 1, 2005) (Garaufis, J.), *aff'd*,
227 F. App'x 51 (2d Cir. 2007) ....... 22

*Melman v. Montefiore Med. Ctr.*,
98 A.D.3d 107 (1st Dep't 2012) ....... 12, 13

*Raskin v. Wyatt Co.*,
125 F.3d 55 (2d Cir. 1997) ....... 12

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000) ....... 11, 13

*Sellick v. Agency-Castle Point*,
No. 09 Civ. 6616 (DLC), 2010 WL2813431, (S.D.N.Y. July 16, 2010) (Cote, J.) ....... 16

*Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*,
165 F.3d 1321 (10th Cir.1999) ....... 13

*Sista v. CDC Ixis N. Am., Inc.*,
445 F.3d 161 (2d Cir. 2006) ....... 12

*Slattery v. Swiss Reinsurance Am. Corp.*,
248 F.3d 87 (2d Cir. 2001) ....... 18

*Texas Dep't of Cmty. Affairs v. Burdine*,
450 U.S. 248 (1981) ....... 11

*Tomassi v. Insignia Fin. Grp., Inc.*,
478 F.3d 111 (2d Cir. 2007) ....... 11

**STATUTES**

Age Discrimination in Employment Act ("ADEA") .......... 1, 11, 12, 17

New York City Human Rights Law ("NYCHRL") .......... 1, 11, 12, 14, 17

New York State Human Rights Law ("NYSHRL") .......... 1, 11, 12

## PRELIMINARY STATEMENT

Plaintiff Kathleen Mullinix ("Mullinix") was hired by Defendant Icahn School of Medicine at Mount Sinai ("Mount Sinai") in 2009 at age 65 and promoted one year later. Mullinix's claim that she was denied another promotion in 2011 because of her age is thus preposterous. Mount Sinai hired Teri Willey ("Willey"), then age 51, for the position sought by Mullinix because of Willey's exceptional qualifications, impressive recommendations and extensive experience in comparable positions. There is no evidence that this decision was motivated by discriminatory animus based on age. Indeed, the individuals who decided to hire Willey – Dean Dennis Charney ("Charney") (who also decided to promote Mullinix in 2010) and Dr. Kenneth Davis ("Ken Davis") – are both in their 60's.

Mullinix will likewise be unable to present evidence that Willey's decision not to renew her contract was discriminatory. Mullinix had poor relationships with many faculty, staff and business colleagues, and by March 2012, Willey was no longer willing to spend her time performing "damage control" to improve Mullinix's frayed relationships and ineffective negotiation tactics. Accordingly, Mullinix's claims under the Age Discrimination in Employment Act ("ADEA"), the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL") cannot withstand summary judgment and should be dismissed.

Mullinix's breach of contract claim should also be dismissed because Mullinix is not entitled to any severance benefits under the terms of her employment agreement.

## STATEMENT OF UNDISPUTED FACTS

### Mount Sinai Hires Mullinix At Age 65

Mount Sinai's Office of Technology and Business Development ("OTBD") is responsible for educating Mount Sinai's faculty regarding commercialization of intellectual property and partnering with faculty and biotech/pharmaceutical corporations to transfer medical breakthroughs from Mount Sinai to the public. (Plevan Decl., Ex. 6 (Charney) at 23-24).[1] Given the close working relationship between Mount Sinai faculty and the OTBD, it is essential that OTBD employees maintain positive relationships with Mount Sinai's faculty. (Plevan Decl., Ex. 2 (Mullinix) at 19; Ex. 8 (K. Davis) at 37).

In October 2009, Mullinix was hired by Mount Sinai at the age of 65 as the Associate Director for Business Development in the OTBD. (Plevan Decl., Ex. 2 (Mullinix) at 6-7). Before being hired by Mount Sinai, Mullinix interviewed with Charney, Dr. Patrick McGrath ("McGrath"), then the OTBD Executive Director, and Dr. Bonnie Davis ("Bonnie Davis"), Chairman of the Technology Transfer Committee of the Board of Trustees. (Plevan Decl., Ex. 2 (Mullinix) at 15, 17; Ex. 9 (B. Davis) at 19). Charney approved Mullinix's hire. (Plevan Decl., Ex. 13 at D48).

### Charney Promotes Mullinix To OTBD Director At Age 66

In or about July 2010, Ken Davis, The Mount Sinai Medical Center's President and Chief Executive Officer, and Charney decided to remove McGrath as the OTBD Executive Director and to conduct a search for a Vice President of Technology and Business Development ("VP, OTBD") who would have overall responsibility for OTBD as well as the development of a

[1] Excerpts of the deposition transcripts and documents cited herein are attached as exhibits to the Declaration of Bettina B. Plevan, Esq., dated December 20, 2013 ("Plevan Decl."). References to deposition transcripts include the name of the deponent in parenthesis.

Mount Sinai Technology Fund. (Plevan Decl., Ex. 6 (Charney) at 25, 27-28, 44-45; Ex. 4 (Silberstein) at 70-71; Ex. 8 (K. Davis) at 9, 16-17, 20).

Charney decided to promote Mullinix (then, age 66) to the position of OTBD Director to lead the office during the search for a candidate to fill the new VP, OTBD position and to give her a significant salary increase. (Plevan Decl., Ex. 6 (Charney) at 29, 51, 59-60). Charney directed Mullinix to contact Jeff Silberstein ("Silberstein"), Mount Sinai's Dean for Operations and Chief Operating Officer and the Chief Administrative Officer of the Mount Sinai Medical Center, to work out the details of her new position. (Plevan Decl., Ex. 2 (Mullinix) at 41-42; Ex. 4 (Silberstein) at 37; Plevan Decl., Ex. 14). Charney also told Mullinix then that Mount Sinai was going to create a VP, OTBD position and that an executive search firm would be hired to conduct the search for that position. (Plevan Decl., Ex. 2 (Mullinix) at 40-41, 115). Mullinix told Charney that she wanted to be considered for the VP, OTBD position. (*Id.*).

The negotiations between Mullinix and Silberstein were protracted and difficult. (Plevan Decl., Ex. 2 (Mullinix) at 91-93; Ex. 6 (Charney) at 40-41; Ex. 4 (Silberstein) at 86-87, 92-97). They took almost four months and were marked by what Silberstein perceived to be Mullinix's unreasonable demands regarding severance benefits and language changes to the contract. (Plevan Decl., Ex. 4 (Silberstein) at 86-87, 92-97). On September 29, 2010, Silberstein informed Charney that Mullinix's "behavior and tone" during the negotiations had been "questionable at best" and warned that her conduct "doesn't bode well for the marriage." (Plevan Decl., Ex. 16).

Notwithstanding Silberstein's reservations, Charney agreed to give Mullinix the two-year contract and the $250,000 salary that she demanded (which constituted a raise of approximately $100,000). (Plevan Decl., Ex. 2 (Mullinix) at 91-93; Ex. 6 (Charney) at 58-59; Ex. 16; Ex. 17). Charney also agreed to Mullinix's demand that she receive a minimum of six months of

severance if she was terminated without cause during the term of the contract and that Mullinix would be a candidate for the VP, OTBD position. (*Id.*).

**Charney Develops Concerns About Mullinix's Interpersonal Skills**

From July 21, 2010 until approximately May 2011, Mullinix reported to Charney. (Plevan Decl., Ex. 6 (Charney) at 62-65). Although Charney believed that Mullinix did a good job reorganizing the OTDB during this period, he developed concerns about Mullinix's interpersonal relationships with Mount Sinai faculty and external entities with whom Mullinix dealt because of complaints he received from faculty members regarding negative interactions with Mullinix. (Plevan Decl., Ex. 6 (Charney) at 120-21, 243-44). In addition, during her regular meetings with Charney, Mullinix expressed strong, negative opinions about some faculty members, and Charney grew concerned about the intensity and negativity of Mullinix's feelings. (Plevan Decl., Ex. 6 (Charney) at 121-22, 126-27). Charney shared his concerns about Mullinix with Ken Davis. (Plevan Decl., Ex. 8 (K. Davis) at 21).

**Mount Sinai Conducts A Search For The VP, OTBD Position**

In October 2010, Mount Sinai retained an executive search firm led by Sean McCooe ("McCooe") to identify candidates for the VP, OTBD position. (Plevan Decl., Ex. 4 (Silberstein) at 109; Ex. 6 (Charney) at 47; Ex. 7 (McCooe) at 83; Ex. 18). Ken Davis and Charney were responsible for making the decision about which candidates to interview and ultimately hire. They were both seeking to hire a candidate with strong leadership skills who had run a faculty-friendly technology transfer office in an academic, medical environment. (Plevan Decl., Ex. 8 (K. Davis) at 23, 41; Ex. 6 (Charney) at 72-75, 130-31, 140-41; Ex. 4 (Silberstein) at 118-19; Ex. 7 (McCooe) at 110).

In or about October 2010, McCooe met with Silberstein, Charney, Ken Davis and Bonnie Davis to review the search process. (Plevan Decl., Ex. 7 (McCooe) at 113-14; Ex. 9 (B. Davis) at 46-49; Ex. 6 (Charney) at 47-48; Ex. 4 (Silberstein) at 110).[2]

**Mount Sinai Considers Mullinix For The VP, OTBD Position**

On January 20 and 21, 2011, before Willey was interviewed, Mullinix interviewed for the VP, OTBD position with Davis, Charney, and faculty members Dr. Ross Cagan ("Cagan") and Dr. Roger Hajjar ("Hajjar"). (Plevan Decl., Ex. 2 (Mullinix) at 133). Although Mullinix exhibited many of the qualifications for the VP, OTBD position, both Charney and Ken Davis did not believe that Mullinix would be able to partner effectively with faculty members because some faculty members had expressed a negative opinion of Mullinix. (Plevan Decl., Ex. 9 (K. Davis) at 26-27, 37; Ex. 6 (Charney) at 120-21).

**Mount Sinai Hires Teri Willey As The VP, OTBD**

Willey had served for almost five years as the Chief Executive of Cambridge Enterprise Limited, a subsidiary of the University of Cambridge responsible for the commercialization of technology created by university faculty. (Plevan Decl., Ex. 3 (Willey) at 36-37; Ex. 26 at D881-84). Before serving as the Chief Executive of Cambridge Enterprise Limited, Willey had also served as Vice President of the technology transfer arm of the University of Chicago and the Managing Partner of an early stage venture fund focused on investing in spinouts from University technology transfer programs. (Plevan Decl., Ex. 3 (Willey) at 26-35; Ex. 26 at D881-84). Willey had also worked in the technology transfer offices at Northwestern University

[2] McCooe also met with a number of faculty members who were going to be interviewing candidates for the VP, OTBD position to understand their experiences working with OTBD. (Plevan Decl., Ex. 7 (McCooe) at 110-114; Ex. 21). Some faculty members informed McCooe that Mullinix was "not representing them well" and that they preferred not to have dealings with her. (Plevan Decl., Ex. 7 (McCooe) at 175).

and Purdue University and had served as the President of the Association of University Technology Managers ("AUTM"). (*Id.*).

Charney and Ken Davis believed that Willey could be a "superstar" because of her extensive experience working in technology transfer offices at various distinguished universities. (Plevan Decl., Ex. 6 (Charney) at 141-42; Ex. 8 (K. Davis) at 27-28, 30). They were also impressed by Willey's service as President of AUTM. (*Id.*). On January 26 and 27, 2011, Willey interviewed with Silberstein, Ken Davis, Charney, Hajjar, Cagan, Robert Desnick and Michael McDonald, Mount Sinai's General Counsel. (Plevan Decl., Ex. 3 (Willey) at 69; Ex. 6 (Charney) at 143-44). She also made a presentation to a group of faculty members that was well-received. (*Id.*).

Charney asked Mullinix to meet with Willey during her two days of interviews at Mount Sinai. (Plevan Decl., Ex. 3 (Willey) at 69; Ex. 2 (Mullinix) at 350). After meeting with Willey, Mullinix emailed McGrath and described Willey as an "excellent self-promoter." (Plevan Decl., Ex. 2 (Mullinix) at 350, 356-57; Ex. 28). Mullinix further opined that Willey would "probably get the job" because Mullinix could "see how [Mount Sinai] would fall for her starting company routine." (*Id.*).

After Willey's interviews, McCooe sent Silberstein four exceptional recommendations regarding Willey's candidacy. (Plevan Decl., Ex. 29; Ex. 30; Ex. 31; Ex. 32). Silberstein (who interviewed all of the candidates for the VP, OTBD position) informed Charney and Davis that he believed that Willey was clearly the best candidate for the position because her credentials and personality would be a "perfect fit" with Mount Sinai's faculty. (Plevan Decl., Ex. 4 (Silberstein) at 111; Ex. 8 (K. Davis) at 28). Hajjar similarly informed Charney that Willey was "phenomenal"; Hajjar believed that Willey was a better candidate than Mullinix because Willey

had significantly more experience leading a technology transfer office. (Plevan Decl., Ex. 5 (Hajjar) at 16, 26-30)

After considering Willey's background, experience, recommendations and interviews, Ken Davis and Charney concluded that Willey was "clearly" the top candidate for the VP, OTBD position and they decided to extend Willey an offer of employment. (Plevan Decl., Ex. 6 (Charney) at 72-75, 143-46, 149-51; Ex. 8 (K. Davis) at 23, 34-35; Ex. 4 (Silberstein) at 111, 151-52). Willey accepted Mount Sinai's offer and commenced employment with Mount Sinai on June 1, 2011. (Plevan Decl., Ex. 3 (Willey) at 80; Ex. 2 (Mullinix) at 82). Mullinix began reporting to Willey on that date. (Plevan Decl., Ex. 2 (Mullinix) at 153).

**Willey Recognizes Mullinix's Performance Deficiencies**

Soon after arriving at Mount Sinai, Willey received complaints from faculty members and staff regarding Mullinix's work performance and demeanor. (Plevan Decl., Ex. 3 (Willey) at 127-130). By email dated August 11, 2011, a faculty member (Dr. Peter Palese) informed Willey that he did not trust Mullinix because she lied to him about the status of a collaborative agreement with a third party healthcare company. (Plevan Decl., Ex. 33). In addition, Dr. Palese complained about Mullinix's performance generally – stating that she exhibited an "inability to lead [the] negotiations" and that she had "unnecessarily delayed the process." (*Id.*).

Willey received complaints about Mullinix's conduct from other faculty members and observed that Mullinix was antagonistic, caustic and negative in her dealings with facilities personnel (who were assisting OTBD with securing new office space), the Associate Dean for Grants and Contracts, the General Counsel, office staff members, and administrative assistants (including Ken Davis' executive assistant who told Willey that Mullinix was "brusk and rude"). (Plevan Decl., Ex. 3 (Willey) at 244, 251-53, 278-79). On two occasions, Mullinix sent emails

that were highly critical of key staff members directly to them. (Plevan Decl., Ex. 2 (Mullinix) at 253-57; Ex. 3 (Willey) at 257-58; Ex. 34; Ex. 35). As a result of one of the emails, Rama Iyengar ("Iyengar"), the Associate Dean for Planning & Resource Management, asked Willey not to include Mullinix in any further matters regarding facilities and office space, which was an important issue to OTBD at the time. (Plevan Decl., Ex. 3 (Willey) at 255-56).

Mullinix's December 2011 self-evaluation, reflecting little insight, gave herself the highest possible rating for each performance category. (Plevan Decl., Ex. 2 (Mullinix) at 165-66; Ex. 40). Willey did not agree with these ratings and believed that Mullinix needed to improve her performance drastically in many areas, including her attitude, respect, teamwork and customer service orientation toward the faculty. (Plevan Decl., Ex. 3 (Willey) at 127, 155-60; Ex. 41). Specifically, based on the complaints that she had received and her own interactions with Mullinix, Willey believed that Mullinix was often "dismissive and derogatory" when discussing the faculty with members of the OTBD staff and that she had not demonstrated a willingness to cooperate with her counterparts in the institution in order to solve problems for the office. (*Id.* at 127-28). Willey also believed that Mullinix took an overly aggressive approach in negotiating agreements, which Mount Sinai's potential business partners viewed negatively. (*Id.* at 268, 274). Notwithstanding her criticisms of Mullinix's performance, Willey recommended that Mullinix receive a bonus for 2011 because of Mullinix's positive contributions to operations improvements, asset evaluation and litigation preparation. (*Id.* at 105; Ex. 42).

On December 16, 2011, Willey and Mullinix met to discuss Mullinix's performance. (Plevan Decl., Ex. 2 (Mullinix) at 169-70; Ex. 3 (Willey) at 169). Willey informed Mullinix that she needed to place more emphasis on increasing transactions and partnering as opposed to

negotiating deals to death and that she rated Mullinix "needs improvement" regarding her compassion, attitude, respect and teamwork. (Plevan Decl., Ex. 2 (Mullinix) at 173-74; Ex. 41).

A few days later, a prominent faculty member (Dr. Hugh Sampson) complained to Willey about a negotiation that Mullinix was supervising. (Plevan Decl., Ex. 2 (Mullinix) at 225; Ex. 3 (Willey) at 237-38, 263; Ex. 37; Ex. 38). Dr. Sampson was extremely concerned after the company's Chief Executive Officer threatened to end the negotiations unless Dr. Sampson was "able to change the academic/industry partnering philosophy of [Mount Sinai's] licensing group." (Ex. 37). In response to Dr. Sampson's complaint, Willey removed Mullinix from the negotiations and criticized her negotiation techniques, informing Mullinix that negotiations appeared to be a "battle" for her and "not a partnering exercise." (Plevan Decl., Ex. 2 (Mullinix) at 236, 241; Ex. 39; Ex. 38).

On February 28, 2012, the Technology Transfer Committee of the Board of Trustees met for a status report on the OTBD's activities. (Plevan Decl., Ex. 2 (Mullinix) at 259-62). Mullinix and colleague Bob Hellauer ("Hellauer") presented at the meeting and Willey was supposed to have given a "wrap up" of the OTBD's activities. (*Id.* at 264). Due to the length of Mullinix's presentation, Hellauer did not present on several slides and Willey was unable to make any presentation. (*Id.* at 263-64; Ex. 3 (Willey) at 342-44).

After the meeting, Willey informed Mullinix that she believed that Mullinix had "hijacked" the presentation for her own self-promotion. (Plevan Decl., Ex. 3 (Willey) at 342-44; Ex. 43). Mullinix's response was confrontational and inappropriate, accusing Willey (her boss) of being unprofessional, untruthful and exhibiting "destructive behavior." (Plevan Decl., Ex. 2 (Mullinix) at 266-67; Ex. 44). Mullinix also accused Willey of engaging in a "diatribe" regarding the OTBD's performance during a meeting of senior management that had taken place

on February 23, 2012 and challenged Willey's criticisms of Mullinix's performance. (Plevan Decl., Ex. 44).

**Willey Decides Not To Renew Mullinix's Contract**

Willey had grown tired of Mullinix's hostility and she was no longer willing to "put the time and effort into damage control" resulting from complaints that Willey had received from faculty, staff and potential business partners regarding their frustrations working with Mullinix. (Plevan Decl., Ex. 3 (Willey) at 206, 225, 233-35, 298-99). Accordingly, on March 8, 2012, Willey told Mullinix that Mount Sinai would not renew her contract upon its expiration in July 2012 but that Willey was open to continuing to work with Mullinix in a different role at Mount Sinai where Mullinix could leverage her strengths. (Plevan Decl., Ex. 2 (Mullinix) at 270-71; Ex. 3 (Willey) at 305-09, 340). However, when Willey met with Mullinix on March 22, 2012 to discuss the transition of her job duties, Mullinix was so contentious that Willey doubted that she could work with Mullinix ever again. (Plevan Decl., Ex. 3 (Willey) at 346-47).

Dr. Scott Friedman ("Friedman"), who had recently been appointed the Dean for Therapeutic Discovery, had also received complaints from faculty members that they found Mullinix "abrasive" and an "ineffective partner." (Plevan Decl., Ex. 10 (Friedman) at 8, 43-48). On March 28, Friedman informed Willey (who now reported to him) that he too had received unsolicited feedback from faculty members about their frustrations working with Mullinix and that he was comfortable that Willey's decision not to renew her contract was "the right one." (Plevan Decl., Ex. 48).

## ARGUMENT

### I.

### THE COURT SHOULD DISMISS MULLINIX'S AGE DISCRIMINATION CLAIMS

Claims of discriminatory treatment are analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 114 & n.3 (2d Cir. 2007) (ADEA, NYSHRL and NYCHRL claims analyzed together under *McDonnell Douglas*). The *McDonnell Douglas* standard requires that Mullinix establish a *prima facie* case of discrimination by showing that (1) she is part of a protected class; (2) she was qualified for her position; (3) she suffered an adverse employment action and (4) the circumstances surrounding the employment action give rise to an inference of discrimination.

If Mullinix can establish a *prima facie* case, the burden shifts to Mount Sinai to proffer a legitimate, nondiscriminatory reason for the adverse employment action. *McDonnell*, 411 U.S. at 802. At this stage, Mount Sinai need only proffer, not prove, the existence of a nondiscriminatory reason for the challenged employment decision. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981). "This burden is one of production, not persuasion, it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (citation and internal quotation marks omitted).

If Mount Sinai meets its burden of production, the burden shifts back to Mullinix to show that the legitimate, nondiscriminatory reason offered by the defendant is mere pretext for age discrimination. *McDonnell*, 411 U.S. at 804. To meet this burden in an age discrimination case, Mullinix must show both that Mount Sinai's reasons were false, and that "but for" her age, Mullinix would have been promoted to the VP, OTBD position and her employment would not

have been terminated. *See Gross v. FBL Fin. Servs.*, 557 U.S. 167, 177 (2009) (holding that to prevail under the ADEA, "the plaintiff retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action"); *Gannon v. UPS*, No. 12-3556-CV, 2013 U.S. App. LEXIS 14319, at *3 (2d. Cir. July 16, 2013) (summary order) ("To prevail on claims of age discrimination under the NYSHRL, plaintiff must meet his burden of showing a triable issue as to whether age was a 'but for' cause of her termination").

In *Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107 (1st Dep't 2012), the First Department held that on a motion for summary judgment under the NYCHRL courts should apply both the *McDonnell Douglas* analysis and the so-called "mixed-motive" analysis.[3] 98 A.D.3d at 113-14; *Bennett v. Health Mgmt. Sys. Inc.*, 92 A.D.3d 29, 41 (1st Dep't 2011), *leave to appeal denied*, 18 N.Y.3d 811 (2012)). The court in *Melman* further held that a plaintiff can avoid summary judgment only if she raises a material issue of fact as to whether her employer's actions were false and "discrimination was the real reason" or "whether the action was 'motivated at least in part by . . . discrimination' or, stated otherwise, was 'more likely than not based in whole or in part on discrimination.'" *Melman*, 98 A.D.3d at 113-14, 127 (*quoting Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 305 (2004).

A plaintiff may not defeat summary judgment merely with conclusory allegations of discrimination. *Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 244 (S.D.N.Y. 2001) (Scheindlin, J.), *aff'd*, 51 F. App'x 55 (2d Cir. 2002) ("Statements that are devoid of any

[3] Although not addressed by the First Department in *Melman*, the mixed-motive analysis as applied by federal courts in New York requires a threshold showing by the plaintiff of evidence of discriminatory motive on the part of the defendant. As the Second Circuit has held, "[t]o warrant a mixed-motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 61 (2d Cir. 1997)). Mullinix has offered no "smoking gun" or a "thick cloud of smoke."

specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment") (citation omitted). Rather, a party opposing summary judgment "must set forth specific facts showing that there is a genuine issue for trial." *Id.* Thus, Mullinix may not rest upon mere allegations or vague statements to support her claims of discrimination, but must set forth sufficient evidence that would permit a rational trier of fact to reach that conclusion. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).

Under these standards, there is insufficient evidence upon which a reasonable jury could find for Mullinix on either of her discrimination claims.

### A. <u>Mullinix Cannot Establish that Mount Sinai's Decision To Hire Willey Was Discriminatory</u>

There is no evidence that Mount Sinai's decision to hire Willey for the VP, OTBD position (instead of promoting Mullinix) was because of Mullinix's age, rather than Mount Sinai's belief that Willey was the best candidate for the position.[4] *See Brown v. City of New York*, No. 10 Civ. 3104 (PKC), 2011 U.S. Dist. LEXIS 137880, at *21-22 (S.D.N.Y. Nov. 30, 2011) (Castel, J.), *quoting Reeves*, 530 U.S. at 141 (an age discrimination plaintiff cannot withstand summary judgment unless she can show that her age "actually motivated the employer's decision"), *aff'd*, 512 F. App'x 29 (2013).

It is well-established that courts are not "to act as a 'super personnel department' that second guesses employers' business judgments," and that a court "must respect the employer's unfettered discretion to choose among qualified candidates." *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001) (quoting *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir.1999). *See also*, *Melman*, 98 A.D.3d 107

[4] For purposes of this motion, we assume that Mullinix can satisfy her *prima facie* burden of the *McDonnell Douglas* analysis on this claim.

(evaluating claim under NYCHRL and noting that the court should not second guess nondiscriminatory business judgments.). Moreover, "[w]hen a plaintiff seeks to prevent summary judgment on the strength of a discrepancy in qualifications ignored by an employer … the plaintiff's credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Byrnie*, 243 F.3d at 103 (internal citations omitted).

As shown below, there is no evidence that Charney and Ken Davis decided to hire Willey because of Mullinix's age. Moreover, Mullinix's claim that no reasonable person would have hired Willey instead of Mullinix is totally unsupported (and indeed contradicted) by the undisputed facts. (Plevan Decl., Ex. 2 (Mullinix) at 44-46).[5]

*i.* ***Mount Sinai Hired Willey Because of Her Exceptional Credentials***

Mount Sinai can easily articulate a legitimate, non-discriminatory reason for its decision to hire Willey because Willey met each of the key criteria that Charney and Ken Davis believed were essential for the position. Specifically, for approximately five years before joining Mount Sinai, Willey had led the technology transfer office at the University of Cambridge where, by all accounts, she had developed a successful, faculty-friendly office. (Plevan Decl., Ex. 3 (Willey) at 36-37; Ex. 26 at D881-84; Ex. 30; Ex. 31). Willey had also served as Vice President of the

---

[5] Mullinix alleges in her Complaint that Willey was not qualified for the VP, OTBD position because Willey did not have "15+ year's business experience, including personal participation with the leadership of one or more life-science-based business", as stated in the Position Specification for the role. (Plevan Decl., Ex. 1 ¶ 32). However, before commencing employment with Mount Sinai, Willey had served as the Director of Business Development at Endocyte, a biotechnology company that develops therapeutic targeting products. (Plevan Decl., Ex. 3 (Willey) at 41-42, 47-50). Willey had also served as a member of the Board of Directors of a number of other life-science companies, including Rubicon Genomics and Nephrx, Inc. (*Id.*). Accordingly, Willey had ample personal participation with the leadership of one or more life-science-based businesses.

technology transfer arm of the University of Chicago and had worked in the technology transfer offices at Northwestern University and Purdue University as well as the President of AUTM. (Plevan Decl., Ex. 3 (Willey) at 26-35; Ex. 26 at D881-84). Willey also had substantial business experience in the biotechnology and pharmaceutical industries. (Plevan Decl., Ex. 3 (Willey) at 41-42, 47-50).

In addition to Willey's ample employment and business experiences in the technology transfer field, Mount Sinai received exceptional recommendations regarding Willey's candidacy for the VP, OTBD position. Dr. Michael Cleare, Associate Vice Provost for Research & Executive Director for Technology Transfer at the University of Pennsylvania, said that Willey "has all the requisite experience and has proven self-skillful and political with administration and faculty." (Plevan Decl., Ex. 27). Dr. Kathy Ku, Director, Office of Technology Commercialization at Stanford University, who had worked with Willey on technology commercialization policy and programs, "highly recommend[ed]" Willey for the VP, OTBD position. (Plevan Decl., Ex. 29). Dr. Richard Jennings, Deputy Director of Cambridge Enterprises, described Willey's ability to "get collective support across the university at the highest levels and with the highest respect" as "jaw-dropping" and noted that the Cambridge program was being replicated at other institutions, including Oxford and The Royal Academy of Medicine. (Plevan Decl., Ex. 30). Dr. Nicola Nicholls, Board Member of Cambridge Enterprises, stated that Willey had done a "fantastic job" at Cambridge and described Teri as "the best technology transfer person in the UK." (Plevan Decl., Ex. 31). Finally, Dr. Jon Soderstrom, Managing Director, Office of Cooperative Research at Yale University, described Willey as "very plugged in" and someone who has "great connections" on the East Coast and throughout the United States. (Plevan Decl., Ex. 32).

Although not relevant to the issue of age discrimination, there is no evidence to support Mullinix's speculation that she was not a "serious" candidate for the VP, OTBD position. (Plevan Decl., Ex. 2 (Mullinix) at 44-46). *See Sellick v. Agency-Castle Point*, No. 09 Civ. 6616 (DLC), 2010 WL2813431, at *9-10 (S.D.N.Y. July 16, 2010) (Cote, J.) (holding that the plaintiff's "speculation about the integrity of the hiring process is not sufficient to raise a triable issue of material fact"). It is undisputed that Charney and Ken Davis told Silberstein that Mullinix would be a candidate and that Silberstein relayed that information to McCooe. (Plevan Decl., Ex. 4 (Silberstein) at 121-24; Ex. 7 (McCooe) at 136, 152). There was initially a "miscommunication" between Mullinix and McCooe about whether Mullinix wanted to be considered for the position. (Plevan Decl., Ex. 23). Nevertheless, after Mullinix made it clear to McCooe that she was interested in the pursuing the VP, OTBD position, she was treated as a candidate. Indeed, Mullinix was one of only a handful of candidates (out of approximately 80 candidates who McCooe screened) who interviewed in-person with Ken Davis and Charney. (Plevan Decl., Ex. 7 (McCooe) at 44-48; 147-48; Ex. 6 (Charney) at 131-38, 159-60; Ex. 22).[6] While Charney may have told McCooe that Mullinix would not ultimately be promoted to the VP, OTBD position because Charney had received complaints from faculty members regarding interactions with Mullinix, there is no basis for Mullinix's assertion that her candidacy was not taken "seriously" on account of her age. (Plevan Decl., Ex. 7 (McCooe) at 171-77).

In the end, Mullinix presents only one (alleged) fact to link the decision not to promote her to the VP, OTBD position and her age – a remark by Charney at a March 2011 Dean's

[6] Mullinix testified that her candidacy was not taken seriously because McCooe failed to check her references. (Plevan Decl., Ex. 2 (Mullinix) at 142). However, McCooe testified that he spoke with one of Mullinix's references in the Winter of 2010 and that he did not check any additional references because he did not believe Mount Sinai was going to hire Mullinix for the VP, OTBD position. (Plevan Decl., Ex. 7 (McCooe) at 180-83, 242-43)

Leadership Meeting related to the OTBD that "I am looking for a more youthful approach. The office is going to be different." (Plevan Decl., Ex. 2 (Mullinix) at 59-60).[7] As shown below, this one remark (even if made) is insufficient to show that Mount Sinai's decision to hire Willey was pretextual and/or based on age.[8]

***ii.*** ***<u>Charney's Alleged Statement Is Not Sufficient To Establish Mullinix's Burden of Showing That She Was Not Promoted Because Of Her Age</u>***

This court's decision in *Graves v. Deutsche Bank Securities, Inc.*, No. 07 Civ. 5471 (BSJ) (KNF), 2012 WL 6097712, at *5 (S.D.N.Y. Nov. 30, 2012) (Jones, J.), *aff'd*, No. 12-5082-CV, 2013 WL 6246358 (2d Cir. Dec. 4, 2013), establishes that one remark even by a decision-maker is not sufficient to defeat summary judgment. There, the plaintiff (a former Managing Director in Deutsche Bank's Media Group) alleged that his supervisor (who decided to terminate the plaintiff's employment) allegedly remarked that he "needed Plaintiff's accounts for younger bankers." The court held that the single remark allegedly uttered by the supervisor was "insufficient to prove employment discrimination" under the ADEA and NYCHRL based on the "totality of the evidence," including the fact that the supervisor had originally hired the plaintiff. *Id. See also*, *Jones v. N.Y. City Bd. of Educ.*, No. 09 Civ. 4815, 2012 WL 1116906, at *12 (S.D.N.Y. Apr. 2, 2012) (Sweet, J.) (holding that a decision-maker's alleged statement that "we

---

[7] Although Charney denies making this alleged comment (Plevan Decl., Ex. 6 (Charney) at 147), for purposes of Mount Sinai's motion for summary judgment, we assume that the comment was made.

[8] Notes of an October 15, 2010 telephone conversation between McCooe and Prem Das ("Das"), who was a candidate for the VP, OTBD position (Plevan Decl., Ex. 50) do not provide evidence of age bias. The notes contain a reference to Mullinix's age and employment status. (Plevan Decl., Ex. 50 at 1316). However, McCooe testified that the notes reflect what Das said to McCooe. (Plevan Decl., Ex. 7 (McCooe) at 217). Das could not remember referencing Mullinix's age during his call with McCooe but he also did not recall McCooe saying anything about Mullinix's age or employment status. (Plevan Decl., Ex. 11 (Das) at 8-11). Accordingly, there is no evidence that McCooe ever referenced Mullinix's age during his call with Das. But even if McCooe referenced Mullinix's age during the call with Das, his comments are irrelevant because Mullinix indisputably interviewed in-person with Mount Sinai for the VP, OTBD position (and therefore successfully passed McCooe's initial screening), and McCooe had no authority to hire for the position.

old people should just step back and let them [younger professionals] take over," was insufficient to establish that the defendant was motivated by discriminatory animus). Here, unlike the alleged remarks in *Graves* and *Jones*, Charney's alleged statement does not on its face reflect any age-based animus because it is a comment on the "approach" that the OTBD would take in meeting its objectives.

Moreover, Charney's alleged statement about taking a "youthful approach" must be considered in the context of the case as a whole. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 94 (2d Cir. 2001) (holding that alleged discriminatory comments must be "considered in the context of the case as a whole"); *Brown*, 2011 U.S. Dist. LEXIS 137880, at *26-27 (dismissing plaintiff's age discrimination claims after "[v]iewing the record as a whole").

In this case, the undisputed facts belie any notion that the decision not to select Mullinix for the VP, OTBD position was discriminatory. Charney indisputably interviewed Mullinix and approved her hire when she was age 65. (Plevan Decl., Ex. 2 (Mullinix) at 6-7, 15, 17; Plevan Decl., Ex. 13). Charney also decided to promote Mullinix to OTBD Director, increased her compensation by approximately $100,000, and agreed to Mullinix's request that she receive a two year contract with generous severance benefits and consideration for the VP, OTBD position – all when Mullinix was age 66. (Plevan Decl., Ex. 6 (Charney) at 29, 51, 58-59; Ex. 16; Ex. 17).

Courts have uniformly recognized that an allegation of discrimination is severely weakened when the decision-maker previously hired or promoted the plaintiff. *See Bruder v. Jewish Bd. of Family & Children's Servs.*, No. 10-CV-5951 (MKB), 2013 WL 789231, at *7 (E.D.N.Y. Mar. 4, 2013) (Brodie, J.) (noting that any inference of age animus was "undermined" since the plaintiff was hired at 52 years old and promoted at age 58); *Brown*, 2011 U.S. Dist.

LEXIS 137880, at *26 (applying same actor inference where defendant was "directly responsible" for approving the plaintiff's promotion which resulted in a raise of over $10,000); *Garcia v. Henry St. Settlement*, 501 F. Supp. 2d 531, 541 (S.D.N.Y. 2007) (Sweet, J.) ("[W]here the individual who made the decision identified by a plaintiff as an adverse employment action is the same person who previously promoted that employee, it is difficult to impute ... an invidious motivation, to that individual").

In addition, Charney (who is currently age 62) is close in age to Mullinix, which further belies Mullinix's claim that Charney was motivated by age discrimination. (Plevan Decl., Ex. 6 (Charney) at 8). *See Bruder*, 2013 WL 789231, at *7 (E.D.N.Y. Mar. 4, 2013) (Brodie, J.) (noting that the plaintiff's allegation of discrimination was "weakened" because the decision-makers were 51 years old and the plaintiff was 62 years old); *Brown,* 2011 U.S. Dist. LEXIS 137880, at *25-26 (S.D.N.Y. Nov. 30, 2011) (Castel, J.) (applying "same actor" inference where the decision-maker was also over 40 years old at the time of the events at issue); *Baguer v. Spanish Broad. Sys., Inc.*, No. 04 Civ. 8393 (RJS), 2010 WL 2813632, at *15 (S.D.N.Y. July 12, 2010) (Sullivan, J.), *aff'd*, 423 F. App'x 102 (2d Cir. 2011) (noting that the age of plaintiff's supervisors—45, 49 and 61—undercuts an inference of age discrimination).

In addition to Charney's age and the fact that he indisputably treated Mullinix favorably mere months before Willey was hired, it is further undisputed that Ken Davis also made the decision to hire Willey and Mullinix does not even claim that Ken Davis, who is currently 66 years old, harbored any discriminatory animus. (Plevan Decl., Ex. 2 (Mullinix) at 72; Plevan Decl., Ex. 8 (K. Davis) at 6). Moreover, Mullinix concedes that Willey had "great strengths interacting with faculty," which she knew was important to Charney and Ken Davis. (Plevan Decl., Ex. 2 (Mullinix) at 367-68).

Accordingly, Charney's alleged remark does not establish that the decision to hire Willey was because of Mullinix's age rather than Willey's qualifications.

**B. <u>There Is No Evidence That Willey's Decision Not To Renew Mullinix's Contract Was Motivated by Discrimination</u>**

Mullinix similarly cannot establish that age was the motivating factor in Willey's decision not to renew her contract. In fact, Mullinix concedes that Willey never did or said anything to her that evidences age bias. (Plevan Decl., Ex. 2 (Mullinix) at 72-73). In the end, although Willey recognized that Mullinix possessed some positive attributes, she was "no longer willing to put the time and effort into damage control" resulting from Mullinix's interpersonal issues with Willey, faculty and staff and her recalcitrant style of negotiations. (Plevan Decl., Ex. 3 (Willey) at 298-99).

Willey indisputably received complaints from faculty members and staff regarding Mullinix's work performance and demeanor, including one prominent faculty member who informed Willey that he no longer trusted Mullinix. Willey had also observed that Mullinix was antagonistic, caustic and negative in her dealings with facilities personnel, the associate dean for grants and contracts, the Office of the General Counsel, and office staff members. (Plevan Decl., Ex. 3 (Willey) at 244, 251-53, 278-79). She was also hostile to Willey. (Plevan Decl., Ex. 44). For these reasons, Willey informed Mullinix on March 8, 2012 that she would not renew Mullinix's contract upon its expiration in July 2012. There is simply no evidence that Willey's decision had any relation to Mullinix's age.

***i. <u>Willey's Bonus Memorandum Does Not Establish That Willey's Decision Was Discriminatory</u>***

Willey's recommendation that Mullinix receive a full bonus for 2011 does not call into question Willey's motivation for making the decision several months later not to renew

Mullinix's contract, much less demonstrate that Willey's decision was motivated by Mullinix's age. Willey recommended that Mullinix receive a full bonus for 2011 because of Mullinix's positive contributions to operations improvements, asset evaluation and litigation preparation. (Plevan Decl., Ex. 3 (Willey) at 105; Ex. 42). However, Mullinix admits that Willey repeatedly criticized her performance. (Plevan Decl., Ex. 2 (Mullinix) at 160-62, 253-54, 259). Indeed, just four days after submitting her bonus recommendation, Willey informed Mullinix that her performance, while strong in some areas, needed dramatic improvement – especially regarding her compassion, attitude, respect and teamwork. (Plevan Decl., Ex. 2 (Mullinix) at 169-74; Ex. 3 (Willey) at 169). Thereafter, Willey received a complaint from Dr. Sampson about a partnership negotiation that Mullinix was supervising. In response, Willey informed Mullinix's that she was frustrated by Mullinix's interactions with faculty and criticized Mullinix's negotiation techniques, noting that negotiations appeared to be a "battle" for Mullinix and "not a partnering exercise." (Plevan Decl., Ex. 38).

Accordingly, Willey's December 12, 2011 bonus memorandum does not raise a fact issue that Willey's decision not to renew Mullinix's contract was motivated by age discrimination.

#### *ii.* ***Mullinix's Speculation That Charney Decided Not To Renew Her Contract Should Be Rejected***

Unable to articulate any discriminatory basis for Willey's decision not to renew her contract, Mullinix instead contends that Charney (not Willey) made the decision to terminate her employment. According to Mullinix, Charney "ran the office *de facto* and nothing significant of a decision about the management of that office would be coming from anybody but him." (Plevan Decl., Ex. 2 (Mullinix) at 110). She also claims that in January 2012, Willey told

Mullinix that she had recommended to Charney that Mullinix's contract should be renewed for two more years. (Plevan Decl., Ex. 2 (Mullinix) at 110-111).

Mullinix's contention that Charney must have made the decision because he "ran the office *de facto*" is purely speculative and therefore should be rejected. Furthermore, even if Willey told Mullinix in January 2012 that she had recommended to Charney that Mullinix's contract be renewed, Charney, Willey and Friedman (the only individuals in a position to know who made the decision regarding Mullinix's contract) consistently testified that Willey had the authority and responsibility to decide whether to renew Mullinix's contract and that Willey was the sole decision-maker with respect to Mullinix's contract. (Plevan Decl., Ex. 10 (Friedman) at 39; Ex. 6 (Charney) at 189, 192-95; Ex. 3 (Willey) at 214, 226-27).

In *McPherson v. NYP Holdings, Inc.*, No. 03-cv-4517 (NGG) (LB), 2005 WL 2129172, at *6-7 (E.D.N.Y. Sept. 1, 2005) (Garaufis, J.), *aff'd*, 227 F. App'x 51 (2d Cir. 2007), the plaintiff claimed that it was "very likely" that his supervisor was a decision-maker regarding his compensation because the supervisor had spoken with the other decision-makers regarding the plaintiff's compensation. The court rejected the plaintiff's speculation regarding the supervisor's involvement in the decision because the employer had "provided sworn testimony stating that [the supervisor] was not involved or consulted in decisions regarding [the plaintiff's] pay." *See also Jantz v. Emblem Health*, No. 10-cv-6076 (PKC), 2012 WL 370297, at *10 (S.D.N.Y. Feb. 6, 2012) (Castel, J.) (rejecting plaintiff's contention that there was a triable issue of fact regarding the individual who terminated her employment because plaintiff failed to present admissible evidence to support her belief). Here, Mullinix cannot proffer any evidence that Charney made the decision not to renew her contract and all the sworn testimony is to the contrary.

Accordingly, Mullinix's speculation cannot defeat summary judgment and thus her discriminatory termination claim should be dismissed.[9]

II.

**MULLINIX'S BREACH OF CONTRACT CLAIM SHOULD BE DISMISSED**

Mullinix's breach of contract claim is similarly meritless. Under New York law, the elements of a cause of action for breach of contract are (1) the existence of a contract, (2) performance of the contract by one party, (3) breach by the other party, and (4) damages suffered as a result of the breach. *First Investors Corp. v. Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998). Mullinix's claim fails as a matter of law because she cannot establish that Mount Sinai breached her employment contract by failing to pay her severance benefits.

**A. Mullinix's Employment Was Not Terminated During the Initial Term**

Mullinix's employment contract provided that she was eligible to receive severance benefits only if she ceased to hold the OTBD Director position "by reason of Mount Sinai's termination of [her] employment of such position during the Initial Term." (Plevan Decl., Ex. 17) The Initial Term of the contract was defined in the contract as July 12, 2010 – July 12, 2012. (*Id.*)

Mount Sinai did not terminate Mullinix's employment *during* the Initial Term of the contract. Rather, Willey simply informed Mullinix on March 8, 2012 that she would not be renewing Mullinix's contract upon its expiration in July. Although Mullinix ceased coming into the office after April 13, 2012 on her own accord, her Mount Sinai email account remained active, and Mount Sinai expected that Mullinix would monitor her emails and assist regarding

[9] Even if Charney made the decision not to renew Mullinix's contract (which he did not), Mullinix cannot establish that the decision was discriminatory for the reasons set forth above. *See supra* at 17-19.

the transition of her matters until the expiration of her contract. (Plevan Decl., Ex. 2 (Mullinix) at 283-84; Ex. 4 (Silberstein) at 227-29; Ex. 50). Furthermore, Mullinix remained on Mount Sinai's payroll through July 31, 2012. (Plevan Decl., Ex. 2 (Mullinix) at 334). Accordingly, because Mullinix remained employed throughout the contract term, she was not eligible to receive any severance benefits under the terms of her contract.

**B. Mullinix Failed To Sign A Release Agreement**

Even *assuming arguendo* that Mount Sinai terminated Mullinix's employment during the Initial Term of the contract, she is still not entitled to severance benefits because she did not sign a release agreement. Mullinix's employment agreement specified that if Mullinix became eligible for any severance "as a condition of receiving such amounts, you shall execute and agree to be bound by a waiver and general release of any and all claims … arising out of or relating to your employment with Mount Sinai and termination thereof in such form as may be required by Mount Sinai." (Plevan Decl., Ex. 17).

On April 10, 2012, Mullinix met with Willey and Silberstein and discussed the terms of a severance arrangement whereby Mullinix would cease working at Mount Sinai during the Initial Term of her contract and receive severance benefits. (Plevan Decl., Ex. 2 (Mullinix) at 283-84; Ex. 49; Ex. 4 (Silberstein) at 225-26, 231). On April 13, 2012, Willey emailed Mullinix a release agreement. (Plevan Decl., Ex. 49). Because Mullinix did not sign or agree to sign such a release agreement, her breach of contract claim fails as a matter of law. *See Kaul v. Hanover Direct, Inc.*, 148 F. App'x 7, 9 (2d Cir. 2005) ("Kaul forfeited his right to the severance package by failing to execute a general release in favor of HDI as required, as a condition precedent to receiving severance benefits, by his employment agreement").

For all of the foregoing reasons, Mullinix's breach of contract claim should be dismissed.

## CONCLUSION

For the reasons set forth above, this Court should grant Mount Sinai's motion for summary judgment and dismiss Plaintiff's claims in their entirety with prejudice.

Dated: New York, New York
December 20, 2013

PROSKAUER ROSE LLP

By: Bettina B. Plevan

Bettina B. Plevan
Harris M. Mufson
Eleven Times Square
New York, New York 10036
(t) (212) 969-3065
(f) (212) 969-2900
bplevan@proskauer.com
*Attorneys for Defendant*