David N. Mair [DM-8883]
KAISER SAURBORN & MAIR, P.C.
111 Broadway, 18th Floor
New York, New York 10006
(212) 338-9100

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
KATHLEEN MULLINIX

12 Civ. 8659 (PKC)

Plaintiff,

-against-

MOUNT SINAI SCHOOL OF MEDICINE,

Defendant.
---------------------------------------------------------------x

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. Mullinix's Background, Experience AND Initial Hiring at Mount Sinai by McGrath . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B. Charney's Appointment of Mullinix to be "Interim" Director Under the False Pretense that it Was a Permanent Position . . . . . . . . . . . . . . . . . . . . . . . 2

C. Charney's Direct Admission that Age Was a Central Factor in His Vision of Who he Would Select as Vice President to Head OTBD . . . . . . . . . . . 6

D. Charney's Pretense of Considering Mullinix for the VP Position was a "Sham" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

E. Charney's and Willey's Recognition of Mullinix's Excellent Job Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

F. Mullinix's Sudden Removal as Director in March 2012 Despite Her Superior Job Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

G. The Interim Director Position is Eliminated Thereby Fulfilling Charney's Original Plan that the Vice President Would Replace McGrath as Head OTBD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

POINT I.
PLAINTIFF HAS AMPLY MET HER BURDEN OF DEMONSTRATING GENUINE ISSUE OF MATERIAL FACT THAT SHE WAS NOT GIVEN THE VICE PRESIDENT POSITION AND SUBSEQUENTLY TERMINATED BECAUSE OF HER AGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

POINT II.
CHARNEY'S DIRECT ADMISSION THAT AGE WAS A CENTRAL FACTOR IN HIS VISION OF WHO HE WOULD SELECT AS VICE PRESIDENT TO HEAD OTBD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

POINT III.
PLAINTIFF'S HAS STATED A VIABLE BREACH OF CONTRACT CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

A. Mullinix was Removed as Director During the Initial Term of Her Contract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

B. The Release Provided to Mullinix by Mount Sinai Failed to Comply With Her Contract in Two Fundamental Respects . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## TABLE OF AUTHORITIES

**Cases**

*Bennett v. Health Management Systems, Inc.*, 92 A.D.3d 29,
936 N.Y.S.2d 112. (1st Dep't 2011) . . . . . . . . . . 19

*Carlton v. Mystic Transp., Inc.*, 202 F.3d 129 (2d Cir.2000),
*cert denied* 530 U.S. 1261, 120 S.Ct. 2718,
147 L.Ed.2d 983 [2000] ) . . . . . . . . . . 18

*Dupree v. Uhap Sterling Street Housing Development Fund Corp.*,
2012 WL 3288234 (E.D.N.Y. 2012) . . . . . . . . . . 24

*Ellis v. Century 21 Dept. Stores*,
2013 WL 5460651 (E.D.N.Y. 2013) . . . . . . . . . . 25

*Henry v. Wyeth Pharmaceuticals, Inc.* 616 F.3d 134 (C.A.2 (N.Y.),2010) . . . . . . . . . . 24

*Melman v. Montefiore Medical Center*, 98 A.D.3d 107,
946 N.Y.S.2d 27 (1st Dep't 2012) . . . . . . . . . . 18, 19

*Rosen v. Thornburgh*,
928 F.2d 528 (2nd Cir. 1991) . . . . . . . . . . 18

*Tomassi v. Insignia Financial Group, Inc.*, 478 F.3d 111 (2d Cir.2007) . . . . . . . . . . 23, 24

*Vivenzio v. City of Syracuse*, 611 F.3d 98 (2nd Cir. 2010) . . . . . . . . . . 18

## PRELIMINARY STATEMENT

Plaintiff, Kathleen Mullinix ("Mullinix") submits this memorandum of law in opposition to the motion by defendant, Mount Sinai School of Medicine ("Mount Sinai") for summary judgment.

## STATEMENT OF FACTS

### A. Mullinix's Background, Experience AND Initial Hiring at Mount Sinai by McGrath

Mullinix holds a Ph.D. in Chemical Biology from Columbia University, received postdoctoral training at Harvard University and has had a long and distinguished career as a leader in the field of identification and commercialization of scientific discoveries in the bio-medical sciences. As a result of her scientific training and business expertise she has had outstanding success in the translation of basic scientific discoveries into valuable products that have brought major improvements to public health. [Mullinix Decl. ¶ 3]

As Vice Provost of Columbia University Mullinix established and built that University's technology transfer office and negotiated license agreements between Columbia and pharmaceutical and device companies that have yielded $2 billion in revenues. [Mullinix Decl. ¶ 5] Thereafter, as founder and CEO of Synaptic, Mullinix successfully led the company's transformation from a start-up to a public company that was a leader in its field. Mullinix also developed the scientific and business strategies that yielded Synaptic a patent estate of over 200 patents and multiple collaboration and license agreements with major pharmaceutical companies. She also negotiated all of the company's collaboration and licensing agreements, led all of the private venture capital financing rounds and ultimately led the company's IPO and follow-on offerings in the public equity markets. [Mullinix Decl. ¶ 6]

In October 2009 Mullinix was hired by the then-Director of OTBD, Patrick McGrath as an Associate Director in OTBD. [Mair Decl., Ex. 13] Although she was also interviewed by Dean Charney (as well as three others) during the hiring process, McGrath made it clear to her that the decision as to whether to hire her was his decision and Mount Sinai's own documents confirm that he was the "Hiring Manager." [Mullinix Decl., ¶9; Mair Decl., Ex. 14]

**B. Charney's Appointment of Mullinix to be "Interim" Director Under the False Pretense that it Was a Permanent Position**

Charney had been unhappy with McGrath's performance for some time. [Mair Decl., Ex. 4 (Charney) at 21-25] He saw an opportunity to remove McGrath as head of OTBD because Mullinix was already working at Mount Sinai and could step in immediately to head the office. [Mair Decl., Ex. 3 (Silberstein) at 57; Mair Decl., Ex. 6 (Ken Davis) at 16-17] Charney admitted that he offered her the position heading OTBD because "[he] felt she had strong credentials for that position." [Mair Decl., Ex. 4 (Charney) at 51]

During the first few days of July 2010, Charney offered Mullinix the position of "Interim Director" of OTBD. [Mair Decl., Ex. 1 (Mullinix) at 31-32, 37-39; Mair Decl., Ex. 4 (Charney) at29-30] Mullinix responded that she would be happy to accept the Director position but not on an "interim" basis. *Id.* She explained to Charney that anyone who assumes a position on an interim basis usually has a great deal of difficulty making necessary changes because their leadership is perceived to be temporary. *Id.* Charney said he would think about it. *Id.*

Around July 12, 2010, Charney got back to Mullinix and told her that she would be given the Director position without the "interim" qualification in her title. [Mair Decl., Ex. 1 (Mullinix) at39-41; Mair Decl., Ex. 4 (Charney) at 30-31] At the same time, Charney told Mullinix that he

had decided to create a new position at the Vice President level of the organization that would be a higher level position inserted in the hierarchy between the "Director" position and his position as Dean. [Mair Decl., Ex. 1 (Mullinix) at 39-41] Charney also told Mullinix that a formal search would be conducted but that she would be a "strong" candidate for the VP position. [Mair Decl., Ex. 1 (Mullinix) at 41]

At his deposition in this case, Charney claimed that Mullinix's position was not an interim position: "To repeat my answer, the role that we offered Kathy [Mullinix] and that she accepted was not an interim position ..." [Mair Decl., Ex. 4 (Charney) at 50] However, contemporaneous emails to and from Charney reveal that he always considered Mullinix's position to be interim and had lied to her when he told her it was not. For example, in an email dated July 21, 2010, to Bonnie Davis, a member of Mount Sinai's Board of Trustees and the Chair of the Board committee that oversaw OTBD, Charney stated: "I have told Kathy Mullinix, who is the <u>interim director</u>, to contact you." [Mair Decl., Ex. 40](emphasis added) In the same email he also told Davis that "[w]e are going to start the search process" for a new <u>permanent</u> head of OTBD and "will probably engage a search firm." *Id.* (emphasis added)

Kenneth Davis, who was and is the CEO of Mount Sinai and the person to whom Charney reports, readily admitted at his deposition that Mullinix's position was always as interim head of OTBD in a temporary role between two permanent heads of the office. He testified that Mullinix headed OTBD "in an interim capacity" between the time McGrath was removed and Willey was hired as the new head of the office. [Mair Decl., Ex. 6 (Ken Davis) at 20] Likewise, Bonnie Davis testified that Dr. Charney appointed Mullinix as the interim director of OTBD while the search was going on for a new permanent head of OTBD. [Mair Decl., Ex. 8 (Bonnie

Davis) at 39-40]

At his deposition, Charney's Chief Administrative Officer, Jeffrey Silberstein, also candidly admitted that he "understood from Dean Charney that it was Dean Charney's intention to put Mullinix into the Director role on an interim basis in order to maintain the department." [Mair Decl., Ex. 3 (Silberstein) at 59] After Mullinix declined the offer of interim director, Silberstein testified that Charney asked him "to meet with Dr. Mullinix and work out an agreement whereby she would assume the role of director, and that it would be <u>limited in duration</u>" because "he was going to start a search for a vice president of an area that would include OTBD." [Mair Decl., Ex. 3 (Silberstein) at 60](emphasis added) Contemporaneous emails between Charney and Silberstein during the negotiations for Mullinix's contract also demonstrate that Charney intended Mullinix to be the head of the office only for as long as it took "to recruit a <u>new chief</u> and get that person started." [Mair Decl., Ex. 30] (emphasis added) Teri Willey, who was later selected by Charney for the Vice President position and to whom Mullinix reported from June 2011 until her removal, also testified that she "considered Dr. Mullinix's role to be an interim director role throughout the time that [Mullinix] worked there." [Mair Decl., Ex. 2 (Willey) at 211]

Ultimately, after being confronted with the evidence, Charney himself was forced to admit at his deposition that the Director position to which he appointed Mullinix would only continue to head OTBD until the Vice President was recruited and appointed, at which point the Vice President would take over such responsibility. [Mair Decl., Ex. 4 (Charney) at 59-60] Indeed, Charney admitted that for this very reason he refused Mullinix's request for an internal announcement to be issued regarding her appointment to the Director position:

Q Is it typical for a position such as the head of OTBD to be announced internally at Mount Sinai in some form of internal announcement?

A It would be typical when we make a recruitment in which the ultimate position has been filled that we would make an announcement internally.

Q Dr. Mullinix asked that an announcement be made internally, a formal announcement be made internally of her appointment to the position of director of OTBD, correct?

A I believe so.

Q No announcement was ever made internally, correct?

A I don't think so.

Q Why not?

A The reason for that is, you know, we knew at that time that we were going to be undertaking a recruitment process for the vice president position. [Mair Decl., Ex. 4 (Charney) at 61]

The decision to create the Vice President of OTBD position was made by Charney who was given "complete autonomy" over such decisions by CEO Ken Davis. [Mair Decl., Ex. 6 (Ken Davis) at 19] Although Charney claimed at his deposition the decision was a "joint" one with Davis, Davis flatly denied this stating "It wasn't my idea." [Mair Decl., Ex. 4 (Charney) at 44-45; Mair Decl., Ex. (Ken Davis) at 19] There is no evidence Charney had any intention of creating the new Vice President position before Mullinix declined to head the OTBD as "Interim Director" and Silberstein testified that the first time Charney mentioned the idea to him was during the period Silberstein was working with Mullinix on her offer letter. [Mair Decl., Ex. 3 (Silberstein) at 61-62]

## C. Charney's Direct Admission that Age Was a Central Factor in His Vision of Who he Would Select as Vice President to Head OTBD

The decision regarding who to hire for the Vice President position was Charney's decision to make. As CEO Ken Davis confirmed at his deposition, "the decision making as to who was hired for the vice president position [was] a decision by Dean Charney in which [Davis] had concurrence." [Mair Decl., Ex. 6 (Ken Davis) at 23] Davis explained what he meany by "concurrence": "I give the Dean a lot of discretion to do his job and only if I have a strong objection would I have changed that decision." [Mair Decl., Ex. 6 (Ken Davis) at 17] Davis also emphasized that "[o]n areas of personnel, I give [Charney] almost complete autonomy." [Id.]

On March 12, 2011, during the final stages of the Vice President search, Mullinix was in attendance at a meeting of the Dean's Leadership Council that was also attended by more than 50 other people. [Mair Decl., Ex. 1 (Mullinix) at 58-62; Mair Decl., Ex. 57] During the meeting Charney gave an update regarding the status of the search for the Vice President of OTBD in which he stated that he was seeking to bring a "more youthful approach" to OTBD.[Mair Decl., Ex. 1 (Mullinix) at 58-62]

The notes of a telephone interview Sean McCooe, the search director, had with Prem Das, one of the candidates subsequently interviewed for the VP position at Mount Sinai, contain the following reference: "Kathleen [Mullinix] mid 60s to retire" [Mair Decl., Ex. 56] Das denied knowing Mullinix's age and therefore could not have made the statement to McCooe. [Mair Decl., Ex. 10 (Das) at 8-9] Moreover, McCooe routinely included in his notes statements that he (McCooe) had made to the other party in a telephone conversation. [Mair Decl., Ex. 5 (McCooe) at 295-301; Mair Decl., Ex. 61]

McCooe claimed at his deposition that he did not know Mullinix's age. [Mair Decl., Ex. 5 (McCooe) at 348] However, McCooe's own electronic notes on Mullinix explicitly state Mullinix's age. [Mair Decl., Ex. 5 (McCooe) at 346-348; Mair Decl., Ex. 58] These facts give rise to the strong inference that McCooe had been told by Mount Sinai that Mullinix was about to retire because of her age.

Although Charney claimed at his deposition that he and Ken Davis made a joint decision on which candidates would progress to the Mount Sinai interview phase, Ken Davis categorically denied any involvement in the decision. [Mair Decl., Ex. 4 (Charney) at 131; Mair Decl., Ex. 6 (Ken Davis) at 24] Charney selected four candidates other than Mullinix and Willey to be proceed to be interviewed by him. These candidates were 43, 45, 53 and 57 years of age at the time they were interviewed. Hence, all of the other candidates interviewed by Charney were between 10 and 25 years younger than Mullinix. [Mullinix Decl. ¶ 189]

Teri Willey, who was selected for the Vice President position, was 51 years of age at the time of her selection, i.e. 16 years younger than Mullinix who was 67 years of age at that time. [Mair Decl., Ex. 2 (Willey) at 5; Mair Decl., Ex. 1 (Mullinix) at 6]

### D. <u>Charney's Pretense of Considering Mullinix for the VP Position was a "Sham"</u>

Charney told Mullinix that she was a strong candidate for the Vice President position. Her contract for the Director position, signed on October 13, 2010, also specifically confirmed that she "will be a candidate for that position." [Mair Decl., Ex. 32]. However, when McCooe scheduled a meeting with Mullinix at a coffee shop on November 9, 2010 he did not seem interested in discussing her candidacy or her credentials and the meeting could not be considered an interview by any stretch of the imagination. [Mullinix Decl. ¶ 10]

On or about December 22, 2010, Mullinix asked Charney about the status of the Vice President search at one of their regular meetings. Charney told her that he did not think she was interested in the position, which directly contradicted Charney's previous assurance to Mullinix that she would be a "strong" candidate for the VP position.. Mullinix responded to Charney that she did not know how he could have gained such an impression and reiterated that she had always wanted the job. [Mullinix Decl. ¶ 11]

At his deposition, McCooe claimed that Mullinix had allegedly told him at the coffee shop meeting on November 9, 2010 that she did not want to be a candidate for the Vice President position. [Mair Decl., Ex. 5 (McCooe) at 129-132, 144-145; Mair Decl., Ex. 54] However, Mullinix has categorically denied saying any such thing. [Mullinix Decl. ¶ 10] Moreover, Charney himself denied having any memory of McCooe ever telling him at any time that Mullinix did not want to be a candidate for the position. [Mair Decl., Ex. 4 (Charney) at 92] McCooe's testimony is also belied by all of the surrounding events, including the fact that the contract for the Director position that Mullinix negotiated and signed on October 12 expressly provided that she would be a candidate.[Mair Decl., Ex. 32]

Moreover, Documents produced by Mount Sinai in this litigation show that as of the end of December 2010 Mullinix had never been listed in any of the monthly status reports reflecting the status of all candidates considered in the VP search process. [Mair Decl., Ex. 33, 34] These reports list all candidates who had ever been considered in the search process, breaking them into categories for those "Under Consideration," "On Hold" and "No Longer Under Consideration." Mullinix's name did not appear in any category, demonstrating that McCooe's story that he interviewed her but did not think she was interested was false.

Following her December 22, 2010 meeting with Charney, Mullinix sent an email the same day to Charney and McCooe reiterating that she wanted to be considered as a candidate for the Vice President position. [Mair Decl., Ex. 53] In response to this email, McCooe's office manager, Liz Lavin, who assisted McCooe with the search, sent an internal email to McCooe stating: "I didn't think they [referring to Charney and Silberstein] were interested in her for the VP role." [Id.]

After receiving Mullinix's December 22, 2010 email, Charney and Silberstein told McCooe to include Mullinix in the search process and stated: "Sean, make sure you do a good interview with Dr. Kathleen Mullinix." [Mair Decl., Ex. 5 (McCooe) at 138] Interviews were also scheduled for Mullinix on January 20 and 21, 2011 at Mount Sinai with Charney, Davis and two senior faculty members. [Mair Decl., Ex. 35] However, Charney expressly told McCooe: "They will interview her <u>but she will not get the job</u>" [Mair Decl., Ex. 5 (McCooe) at 171-174] (emphasis added)

In early April, having heard no official word on how the search process was progressing, Mullinix called Dr. Roger Hajjar – one of the faculty members who had interviewed her – to enquire as to the status of the search. Dr. Hajjar told her he knew nothing of the status of the search and considered the process to have been handled very strangely by Dean Charney. He said that the usual procedure for a search committee was for the participants to meet separately with each candidate and then collectively discuss the candidates and their recommendations with the Dean. In this case, however, the committee had interviewed three candidates but Dean Charney had never convened a meeting to discuss the candidates. As Dr. Hajjar put it to Mullinix: "maybe he [the Dean] already knew what he wanted." [Mullinix Decl. ¶ 12]

Charney ultimately made the decision to hire Willey for the Vice President position. [K. Davis 23] When Charney told Mullinix that he had selected Willey for the Vice President position, Mullinix asked Charney why she had been selected. He responded that the primary reason was that she had "great references." [Mair Decl., Ex. 1 (Mullinix) at 55-57]

However, neither Charney nor McCooe ever bothered to contact the references provided by Mullinix as part of the search process. [Mullinix Decl., ¶ 13] Mullinix therefore emailed McCooe to ask for an explanation as to why he never bothered to check her references. [Dep Ex. 81] McCooe initially falsely claimed that he had spoken to one of her references, Jack Granowitz, the retired Executive Director of Columbia University's technology transfer office. [Mullinix Decl., ¶ 13] However, Granowitz confirmed to Mullinix that he had never been contacted by, or spoken to, McCooe or anyone else regarding the search. [Mair Decl., Ex. 17] When Mullinix confronted McCooe with this inconsistency, McCooe changed his story and instead claimed it had not been necessary to contact her references because Mount Sinai had decided very early in the process that they wanted Willey instead of her. [Mullinix Decl., ¶ 13]

Willey lacked one of only two essential experience requirements specified in the position description developed by Mount Sinai for the Vice President search. The position description indicated that Mount Sinai was seeking a candidate with "15+ year's business experience, including personal participation with the leadership of one or more life-science-based businesses." [Mair Decl., Ex. 31, p.3] Ken Davis admitted at his deposition that Willey had never held such a position. [Mair Decl., Ex. 8 (Bonnie Davis) at 39-40]

Mullinix, on the other hand, in addition to developing Columbia University's technology transfer office, had founded and led for 15 years a life-science based biotechnology company

from its inception to become a public emerging pharmaceutical company with over 150 employees – in other words, precisely the credential that Mount Sinai purported to be looking for in filling the VP position. [Mair Decl., Ex. 18; Mullinix ¶ 6]

The candidate files that McCooe maintained for the Vice President search also underscored that Mullinix had never been genuinely considered as a candidate. First and foremost, her file did not even contain the basic "candidate checklist" which McCooe testified was standard and used for all candidates that reach a certain basic threshold of in their search process including for the Mount Sinai search. [Mair Decl., Ex. 5 (McCooe) at 51-52, 116-120] In the Mount Sinai search, McCooe produced 55 candidate checklists in connection with the search, including one for each of the five candidates other than Mullinix that were interviewed. [Mair Decl., Ex. 51, 52; Mair Decl., Ex. 5 (McCooe) at116-124, 191] By contrast, McCooe's"file" for Mullinix (which consisted of only 13 pages) contained no candidate checklist. [Mair Decl., Ex. 55; Mair Decl., Ex. 5 (McCooe) at 188-192] McCooe had no explanation for its omission. [Mair Decl., Ex. 5 (McCooe) at 192] Moreover, Mullinix's file contained no interview questions although it was McCooe's practice to compile such questions for a candidate's file. [Mair Decl., Ex. 5 (McCooe) at 205-207] Again McCooe had no explanation for this omission. [Mair Decl., Ex. 5 (McCooe) at 207]

## E. <u>Charney's and Willey's Recognition of Mullinix's Excellent Job Performance</u>

Between July 2010 and June 2011, when Willey began in the Vice President position, Mullinix reported directly to Charney and met with him weekly. In December 2010 Charney rated her performance as "Exceeds Expectations." [Mair Decl., Ex. 37; Mair Decl., Ex. 4 (Charney) at 67] Charney also admitted at his deposition that Mullinix's performance continued

to "Exceed Expectations" throughout the entire period of the Vice President search while she reported to him. [Mair Decl., Ex. 4 (Charney) at 67-68] In a memorandum dated May 19, 2011 announcing the appointment of Willey, Charney "express[ed] [his] deep gratitude to Kathy Mullinix for her outstanding performance as Director of OTBD." [Mair Decl., Ex. 38]

Willey also recognized Mullinix's exceptional performance in the position of Director on December 12, 2011 when Willey submitted a memorandum reviewing and highly praising Mullinix's 2011 performance in support for awarding Mullinix a higher bonus than her employment contract required. [Mair Decl., Ex. 49] In her memorandum Willey "recognize[d] the critical contributions" made by Dr Mullinix after she was appointed to head the OTBD office and "initiate a re-start of the [OTBD] program." Amongst other praise in the memorandum, Willey: (a) described in glowing terms many of Mullinix's accomplishments as Director, including the "transforming role" played by "a talented and highly successful professional" hired by Mullinix; (b) commended Mullinix for "design[ing] and develop[ing] a new paradigm for the operations of OTBD that will support the goals of OTBD to create maximal value from the scientific discoveries of [Mount Sinai]'s staff"; (c) praised Mullinix for implementing programs that resulted in "significant cost savings in 2011" and uncovering and collecting "significant income owed to, but not collected by, [Mount Sinai] ... far exceeding $3 million for 2010 and 2011"; (d) praised Mullinix for her "leadership in the office which has been critical"; (e) emphasized that "[al]though many of her contributions have been about bringing operations in line, [Mullinix] is very strong strategically and continues to be intuitive in identifying critical opportunities for the benefit of [Mount Sinai]"; (f) praised Mullinix for her innovation in establishing Blue Mountain Technologies, an internal start-up business designed to bring Mount

Sinai's portfolio of devices and molecular diagnostic reagents to market through commercial partnerships with third parties; (g) praised Mullinix for "successfully [leading] the OTBD component of a litigation that was of great significance to [Mount Sinai]," including personally "design[ing] the financial model for a data-driven analysis of the valuation of the asset [and] identif[ying] the scientific basis of critical arguments and [driving] appropriate parties to effect the necessary scientific work"; and (h) praised Mullinix for "negotiat[ing] a research collaboration agreement with a major pharmaceutical company [which] [n]ot only ... provid[ed] very significant research support but also ... contain[ed] novel provisions of high potential value that have not heretofore been embodied in any other agreement to which the institution is a party." [Mair Decl., Ex. 49]

On December 13, 2011, Willey formally proposed that Mullinix be awarded a 20% bonus which was double the 10% bonus required by Mullinix's employment contract. [Mair Decl., Ex. 19, 32]

On December 16, 2011, Willey forwarded a Performance Appraisal form to Mullinix in which Willey rated Mullinix numerically at 2.2 out of 3. This numerical rating was at the upper end of the category of "Strong Contributor" and only 0.2 lower than the 2.4 rating required for the highest category of "Role Model." However, Willey nevertheless rated Mullinix's 'overall performance" as "Role Model." [Mair Decl., Ex. 20]

## F. <u>Mullinix's Sudden Removal as Director in March 2012 Despite Her Superior Job Performance</u>

The term of Mullinix's initial two-year contract ran through July 2012. [Mair Decl., Ex. 32] On January 4, 2012, Willey emailed Mullinix stating: "Caryn [the Human Resources

Director] explained that we can renew or extend the contract or continue without one. But I expect it is best to have a contract." [Mair Decl., Ex. 21; Mair Decl., Ex. 2 (Willey) at 188] (Emphasis added) In mid January 2012 Willey met with Mullinix and told Mullinix that she would be recommending to Charney that he renew Mullinix's employment contract. However, she told Mullinix that Charney would make the final decision on whether to extend her contract. [Mullinix Decl. ¶ 15]

On February 10, 2012, Willey emailed Scott Friedman, who was about to assume the position of Dean for Therapeutic Discovery with oversight over OTBD, stating: "I would like to talk with you about Kathy's role as Director. It is coming time to make a proposal to extend her contract (it expires this summer) and I would value your input as I put the proposal for this extension together." [Mair Decl., Ex. 22] (emphasis added) The contemporaneous documents therefore demonstrate that, as of February 10, 2012, Willey was not planning to fire Mullinix as Director but rather had given Mullinix a strong performance rating and intended to recommend to Charney that Mullinix's contract be extended.

Less than three weeks later, in an abrupt about-face, Willey suddenly claimed to have made a decision to remove Mullinix as Director. In an email sent by Willey on March 1, 2012, to Silberstein and the Human Resources Director, Willey stated: "I've made a decision not to continue Dr. Mullinix's contract ..." [Mair Decl., Ex. 23] At her deposition, Willey was unable cite any incident, or offer any explanation of what had happened, between February 10, 2012 and March 1, 2012 to make her change her mind about recommending the renewal of Mullinix's contract. [Mair Decl., Ex. 2 (Willey) at 296-299]

Willey testified at her deposition that, at a meeting of the technology transfer

subcommittee of the Board of Trustees that took place on February 29, 2012, Mullinix presented for most of the time allocated to OTBD. [Mair Decl., Ex. 2 (Willey) at 342-344, 349-350] Scott Friedman, the incoming Dean for Therapeutic Discovery who had also attended the meeting, emailed Willey the same day stating "I thought your team did an excellent job today and was delighted to be there to see it." [Mair Decl., Ex. 60; Mair Decl., Ex. 9 (Friedman) at 30-31] However, Willey testified that "a day or two later when I was meeting with Dean Charney he told me in no uncertain terms that he did not want anyone else from our office in those meetings from here out but me..." [Mair Decl., Ex. 2 (Willey) at 344] Willey's testimony therefore places this meeting with Dean Charney as being on the same day as the decision to remove Mullinix as Director.

Willey met with Mullinix on March 8, 2012 and told her that her duties as Director would be removed immediately and her contract would not be renewed when it reached the end of its initial term in July 2012. [Mullinix Decl., ¶16] Mullinix told Willey she was shocked because this was contrary to Willey's recent statement to Mullinix that she was going to recommend renewal of her contract. *Id.* During that meeting Willey admitted that Mullinix had done many "terrific" things in turning the office around and was unable to articulate a plausible reason for Mullinix's removal. Instead, she vaguely asserted that Mullinix was "not faculty friendly" and when, challenged by Mullinix to provide specifics, came up with only one concrete example. *Id.* Incredibly, however, the example Willey provided involved the same Roche research collaboration agreement for which Willey had highly praised Mullinix in the December 2011 memorandum. [Mair Decl., Ex. 49, ¶ 9] Moreover, the only complaint about Mullinix cited by Willey was made nine months earlier – during the Summer of 2011 – by the faculty member

involved in the Roche deal, Peter Palese, who is notorious for being both difficult to deal with and a bully to others at Mount Sinai. [Mullinix Decl., ¶ 19]

After informing Mullinix that she was being removed as Director Willey actively sought out potential roles for Mullinix that would allow her to stay on in a different role at OTBD. For example, in talking points Willey drafts on March 7, 2012 for a discussion with Mullinix the following day, Willey writes: "I would like to carve out several key projects for you to lead ... I am proposing a role other than Director ... there are other areas where your contributions would be greatly valued." The talking points continue: "In [s]ummarizing, we will work with you to develop a role going forward ..." [Mair Decl., Ex. 29]

Mullinix herself made proposals for roles that she could continue to play going forward. In a March 19, 2012 email to Friedman (which she forwarded to Willey), Mullinix suggested two possibilities for a continuing role she could play. [Mair Decl., Ex. 26] Willey testified at her deposition that "I thought the two examples that she gave were good constructive examples." [Mair Decl., Ex. 2 (Willey) at 312] Two days later, in a March 21, 2012 email to Friedman, Willey came up with another project that Mullinix could head going forward. [Mair Decl., Ex. 27]

However, Charney vetoed any continuing role for Mullinix and instructed Willey to terminate her from OTBD immediately. In an email from Willey to the Human Resources Director, dated March 22, 2012, Willey candidly stated: "After talking to [Dean Charney] it is clear that I should take steps to end Kathy's engagement in the office now instead of letting it play out through to the end of her contract." [Mair Decl., Ex. 28] As a result of Charney's March 22 instruction, no further role was offered to Mullinix to continue at OTBD [Mair Decl.,

Ex. 2 (Willey) at 316]

### G. **The Interim Director Position is Eliminated Thereby Fulfilling Charney's Original Plan that the Vice President Would Replace McGrath as Head OTBD**

Throughout the period that Mullinix was in the "Interim" Director position, all of the OTBD staff reported to her. [Mullinix Decl. ¶ 17] Once Willey was hired as Vice President, she was placed directly above Mullinix in the organizational structure but all of the OTBD staff continued to report through Mullinix and Mullinix in turn reported to Willey. *Id.* This is depicted in organizational charts. [Mair Decl., Ex. 15]

After Mullinix was removed as Director, all of her direct reports began reporting directly to Willey. [Mair Decl., Ex. 2 (Willey) at 176-179] This is also depicted in various versions of an organizational chart showing that Mullinix was simply 'removed" from the hierarchy such that the OTBD staff and managers began reporting directly to Willey instead of reporting through Mullinix to Willey. [Mair Decl., Ex. 16]

Hence, in terminating Mullinix and eliminating her "interim" director position, Charney implemented his original plan described in his September 29, 2010 email to Silberstein that they should agree to a two-year contract for Mullinix because "it may take time to <u>recruit a new chief</u> and get that person started." [Dep Ex. 30] (emphasis added)

## ARGUMENT

## POINT I

### PLAINTIFF HAS AMPLY MET HER BURDEN OF DEMONSTRATING GENUINE ISSUE OF MATERIAL FACT THAT SHE WAS NOT GIVEN THE VICE PRESIDENT POSITION AND SUBSEQUENTLY TERMINATED

**BECAUSE OF HER AGE**

The Second Circuit has warned that "employment discrimination is often accomplished by discreet manipulations and hidden under a veil of self-declared innocence. An employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2nd Cir. 1991). Moreover, "[i]t is not the province of the court itself to decide what inferences should be drawn; if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2nd Cir. 2010) (internal quotation marks omitted); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134 (2d Cir.2000) ("Because this is a discrimination case where intent and state of mind are in dispute, summary judgment is ordinarily inappropriate."), *cert denied* 530 U.S. 1261, 120 S.Ct. 2718, 147 L.Ed.2d 983 [2000] ).

With respect to plaintiff's claim under the New York City Human Rights Law ("NYCHRL") the New York State Appellate Division, First Department, has recently reiterated:

> Recognizing the mandate of the LCRRA to construe the NYCHRL as liberally as reasonably possible in favor of plaintiffs to the end that discrimination should not play a role in employment decisions, we agree ... that the plaintiff should prevail in an action under the NYCHRL if he or she proves that unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor, for an adverse employment decision

*Melman v. Montefiore Medical Center,* 98 A.D.3d 107, 127, 946 N.Y.S.2d 27, 40 - 41 (1st Dep't 2012) (internal citations and quotation marks omitted).

"Where a defendant has put forward evidence of one or more non-discriminatory motivations for its actions ... a court should ordinarily avoid the unnecessary and sometimes

confusing effort of going back to the question of whether a prima facie case has been made out. Instead, it should turn to the question of whether the defendant has sufficiently met its burden, as the moving party, of showing that, based on the evidence before the court and drawing all reasonable inferences in plaintiff's favor, no jury could find defendant liable under any of the evidentiary routes—*McDonnell Douglas*, mixed motive, 'direct' evidence, or some combination thereof" *Bennett v. Health Management Systems, Inc.*, 92 A.D.3d 29, 45, 936 N.Y.S.2d 112. (1st Dep't 2011). Here, the defendant has plainly failed to meet this burden.

The evidence here is overwhelming that: (a) Charney put Mullinix into the role of "interim" director to head OTBD only for as long as it took to recruit a new permanent head and bring that person up to speed; (b) he did so because, at age 67, she did not meet his vision of the "more youthful approach" he wanted to bring to the leadership of OTBD; notwithstanding that (c) Charney thought Mullinix was well qualified for the job and had been performing well.

After Mullinix refused Charney's initial offer to head OTBD on an "interim" basis, Charney decided to create the new Vice President position to enable him to appoint Mullinix as Director and conduct a search for the Vice President without Mullinix realizing that the person being recruited would be her successor. Although Charney told Mullinix she would be a strong candidate for the Vice President job, the evidence shows that she was excluded from the search entirely until she discovered what was going on and insisted on being included. At that point Charney instructed the headhunter to schedule her for interviews but admitted to the headhunter that "they will interview her but she will not get the job." A myriad of additional evidence also demonstrates that her candidacy was a sham.

Charney directly admitted while briefing senior management on his search for the Vice

Present that he was seeking to hire someone who would bring "a more youthful approach" to leading OTBD. The five candidates Charney selected to interview were all between 10 and 25 years younger than Mullinix and the candidate he selected, Teri Willey, was 16 years younger than Mullinix. Moreover, the headhunters notes indicated he had been told that Mullinix was in her "mid 60s [and] to retire."

Charney admitted that Mullinix's performance was excellent throughout the period of the search while she was reporting directly to him. Thereafter, once Mullinix began reporting to Willey, Willey too rated her overall performance very highly and in December 2011 drafted a glowing review of Mullinix's performance in support of a request to award Mullinix a bonus that was double the amount provided for in her employment contract. The following month, in January 2012, Willey told Mullinix that she was recommending to Charney that he renew Mullinix's contract when it expired that summer. However, Willey emphasized to Mullinix that the decision would be Charney's.

Against this backdrop of having orchestrated and led a highly successful turnaround of the OTBD, and Willey's confirmation in January that she was recommending a two-year contract extension, Willey abruptly told Mullinix on March 8, 2012 – with no prior warning – that her duties as Director would be removed immediately and her contract would not be renewed when it reached the end of its initial term in July 2012. Willey's purported explanation for Mullinix's removal and termination was utterly belied by Willey's glowing written review of her performance less than three months earlier and Willey's own statement six weeks earlier that she would recommend a renewal contract for Mullinix. At her deposition Willey was unable to offer any explanation of what had happened to make her change her mind.

The real reason for Wiley's abrupt about-face was that Dean Charney decided that Mullinix had fulfilled the purpose for which he had appointed her, namely to head OTBD on an interim basis until a permanent head had been recruited and come up to speed. As Charney told Willey in a meeting: It is time to end Kathy's engagement in the office now. Willey also admitted that Charney had met with her on (or within a day of) the decision to remove Mullinix and told her he did not ever want Mullinix to present again to the Board of Trustees, despite the fact that Mullinix's presentation had been extremely well received.

An email from Willey to the Human Resources Director on underscored that Charney was behind the decision to terminate Mullinix. In that email Willey candidly states: "After talking to [Dean Charney] it is clear that I should take steps to end Kathy's engagement in the office now instead of letting it play out through to the end of her contract." At that point all of Mullinix's direct reports began to report directly to Willey and Mullinix's "interim" position was simply removed from the organization chart. She was never replaced – because her position had always been temporary.

Mount Sinai's defense relies heavily on its narrative that Plaintiff was "hired at 65" and then was allegedly given one promotion before being denied a second. However, this narrative is both false – in that Plaintiff was appointed only to a temporary "interim" position to enable Dean Charney to search for someone younger to fill the role permanently – and misleading in that the original decision to hire Plaintiff as Associate Director was not made by Charney but instead by Patrick McGrath, the former Director of OTBD who recruited and hired Mullinix (and who is listed in Mount Sinai's own documents as her "hiring manager"). For this reason the "same actor" inference simply has no application here.

The other two central pillars of Mount Sinai's defense are similarly baseless. First, it asserts that Charney was not the decision-maker in either the decision to select Willey as Vice President or the decision to terminate Mullinix when she was no longer needed for the interim director role. With respect to the Vice President selection, Mount Sinai asserts that its CEO, Ken Davis, was the joint decision-maker. However, Davis flatly denied this at his deposition and confirmed that he delegated the decision to Charney and gave him "almost complete autonomy." With respect to the decision to remove Mullinix as director, Charney, Davis, Willey and others all confirmed that Mullinix's Director role was an interim one designed to bridge the gap between the removal of the former head of OTBD (McGrath) and the recruitment and coming up to speed of the new head of OTBD (Willey) The evidence lays bare Charney's motivation in creating the Vice President position to enable him to recruit Mullinix's successor without her realizing that her position was only "interim." At the time Mullinix was appointed interim head, Charney admitted in an email that he only needed her until he could "recruit a new chief." Ultimately, after Willey was fully up to speed as Vice President and there was no longer a need for Mullinix's interim role, Charney instructed Willey that it was time to "end Kathy's engagement in the office now."

The second pillar of Mount Sinai's defense – which seeks to overcome a direct admission by Charney of his age bias in denying Mullinix the Vice President position by mischaracterizing it as a "stray remark" – is equally baseless. The case law makes clear that Charney's admission that he was looking to bring a "more youthful approach" to the OTBD office – made in a briefing to senior management regarding the progress of the search itself – is precisely the antithesis of a stray remark. Rather, it is direct evidence of age bias by the decision-maker in the very context

of the decision that he was making.

Finally, Mount Sinai makes much of Charney's own age. At the time he excluded Mullinix from the selection process and selected Willey for the Vice President position, he was 59 years of age. This is simply irrelevant to his views that a person in her late 60s was too old to do a particular job or that she was really on the verge of retiring. Indeed, Charney's own statement indicates that he views tech transfer as a field in which a "more youthful approach" is needed – presumably because of the nature of the field. Moreover, McCooe's notes also indicate that Charney had a concern that Mullinix may retire soon because of her age.

## POINT II

### CHARNEY'S DIRECT ADMISSION THAT AGE WAS A CENTRAL FACTOR IN HIS VISION OF WHO HE WOULD SELECT AS VICE PRESIDENT TO HEAD OTBD

In *Tomassi v. Insignia Financial Group, Inc.*, 478 F.3d 111 (2d Cir.2007), the Second Circuit clarified the approach district courts should take when considering whether isolated "stray remarks" are probative of discriminatory intent:

> [T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination.... The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be.

*Id.* at 115 (internal citation omitted). "The district courts in this circuit have developed a standardized approach for applying these concepts to individual cases. In determining whether a remark is probative, they have considered four factors: (1) who made the remark (i.e., a decision-

maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process)." *Henry v. Wyeth Pharmaceuticals, Inc.* 616 F.3d 134, 149 -150 (C.A.2 (N.Y.),2010)

Here, the direct admission by Charney of his age bias in connection with the Vice President search is highly probative and is the very antithesis of a "stray" remark. First, Charney was the decision-maker in selecting the person to fill the Vice President position. Second, the admission was made during the search process itself. Third, the admission could not be seen as anything but an indication that Charney was looking for someone more "youthful" in filling the position. Fourth, the admission was directly related to the decision-making process. *See Dupree v. Uhap Sterling Street Housing Development Fund Corp.*, 2012 WL 3288234 *7 (E.D.N.Y. 2012) (concluding "remarks are highly probative of discrimination [because:] First, there is at least a factual dispute as to [person's] role in the decision to fire [plainitff]. Second, her comment preceded the Defendants' decision to discharge [plaintiff]. Third, her statement ... is obviously discriminatory. And fourth, her remarks are directly related to the claimed discriminatory motive in terminating [plaintiff] and 'could reasonably be construed ... as explaining why that decision was taken.'"); *Ellis v. Century 21 Dept. Stores,* 2013 WL 5460651 (E.D.N.Y. 2013).

**<u>POINT III</u>**

**PLAINTIFF'S HAS STATED A VIABLE**

## BREACH OF CONTRACT CLAIM

### A. Mullinix was Removed as Director During the Initial Term of Her Contract

Mullinix's employment contract provided that "[i]f [she] cease[s] to hold the Director of the [OTBD] by reason of Mount Sinai's termination of your employment in such position Without Cause during the initial Term, [she] will be paid severance ..." [Dep Ex. 32, p. 2] (emphasis added) Willey met with Mullinix on March 8, 2012 – four months prior to the end of the initial term – and told her that all of her duties as director were being removed. Mullinix Decl. ¶ 16] Over the course of the next two weeks all of her duties were, in fact, removed and on March 22, 2012 Charney instructed Willey to "end Kathy's engagement in the office now instead of letting it play out through the end of her contract. [Mair Decl., Ex. 28] Hence, her employment in the position of Director was terminated by Mount Sinai during the initial term of the contract and Mullinix was entitled to severance.

### B. The Release Provided to Mullinix by Mount Sinai Failed to Comply With Her Contract in Two Fundamental Respects

Mullinix's employment contract required her to execute a "waiver and general release" in a form required by Mount Sinai in order to obtain the contractual severance benefits. [Mair Decl., Ex. 32, p. 4] However, the document entitled "Agreement of Settlement and Release" drafted by Mount Sinai and presented to Mullinix, did not comport with the requirements of her employment contract in two fundamental respects. First, rather than merely proving for Mullinix to waive and release all claims, the proposed settlement agreement went considerably further and would have (a) saddled her with one-sided confidentiality and non-disparagement obligations; and (b) prohibited her from assisting anyone else in their claims against Mount Sinai. [Plevan

Decl., Ex. 49, ¶¶ 6-7] These terms was not a conditions precedent under her employment contract to Mullinix receiving severance benefits but rather were overreaching attempts by Mount Sinai to obtain additional consideration to which it was not contractually entitled. Under the employment agreement.

Moreover, Section III(A) of Dr. Mullinix's employment contract expressly required Mount Sinai to continue her benefits at its expense during the severance period. [Mair Decl., Ex. 32] However, the release agreement drafted by Mount Sinai required Dr. Mullinix to waive payment of benefits and provided only for her salary to be continued. [Plevan Decl., Ex. 49, ¶ 2]

Accordingly, because Mount Sinai failed to provide any waiver and release that complied with the provisions of the employment contract – and instead required that Mullinix waive rights and benefits she was entitled to receive under the employment agreement – Mullinix had no obligation to execute the document as a condition of receiving severance and benefit continuation.

## CONCLUSION

for all of the foregoing reasons, defendant's motion for summary judgment should be denied in its entirety.

Dated: New York, New York
January 31, 2014

Kaiser Saurborn & Mair, P.C.
Attorneys for Plaintiff

By: /s/
David N. Mair [DM-8883]
111 Broadway, 18th Floor
New York, New York 10006
(212) 338-9100