UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
KATHLEEN MULLINIX,

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7-24-14

                              Plaintiff,                           12-cv-8659 (PKC)

               -against-                                           MEMORANDUM
                                                                   AND ORDER

MOUNT SINAI SCHOOL OF MEDICINE,

                              Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

          Dr. Kathleen Mullinix asserts that defendant Icahn School of Medicine at Mount

Sinai, sued herein as Mount Sinai School of Medicine ("Mount Sinai"), violated the Age

Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq., the New York State

Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"),

when it failed to promote her to a Vice President position and later when it terminated her.

Plaintiff Mullinix also alleges breach of contract. Mount Sinai moves for summary judgment in

its favor. For the reasons stated below, Mount Sinai's motion is granted in part and denied in

part.

          Viewing all of the evidence, including a statement made by a decision-maker near

the time that the Vice President position was filled by a younger candidate, a reasonable jury

could find that Mullinix was not promoted because of her age. However, considering the totality

of the evidence and drawing all reasonable inferences in favor of Mullinix, the Court concludes

that no reasonable jury could conclude that Mount Sinai's decision not to renew Mullinix's

contract and to terminate her was because of her age. Mount Sinai has produced evidence that

the termination arose out of soured professional relationships between Mullinix and certain other

employees of Mount Sinai.  Mullinix has not produced evidence which rebuts that legitimate, nondiscriminatory reason for her termination.

Mount Sinai has not demonstrated that it is entitled to summary judgment as to Mullinix's breach of contract claim because a reasonable factfinder, given the evidence set forth by Mount Sinai, could find in favor of Mullinix on the breach of contract claim.

BACKGROUND

The following facts are either not in dispute or, where there is a dispute, the evidence is viewed in the light most favorable to plaintiff as non-movant.[1]

I.   Mullinix is Hired as Associate Director

Mullinix holds a Ph.D. in Chemical Biology from Columbia University and received postdoctoral training at Harvard University.  (Pl. 56.1 ¶ 164.)  Prior to working at Mount Sinai, Mullinix served as Assistant Director of the National Institute of Health, as President, CEO and founder of Synaptic Pharmaceutical Corporation, and as Vice Provost of Columbia University, where she established and built the technology transfer office.  (Pl. 56.1 ¶¶ 165-66.)  As founder and CEO of Synaptic, Mullinix negotiated all of the company's collaboration and license agreements with major pharmaceutical companies.  (Pl. 56.1 ¶ 167.)

Mount Sinai's Office of Technology and Business Development ("OTBD") has the principal objective of "serv[ing] the community by transferring medical breakthroughs from

---

[1] Mount Sinai moved to strike certain of plaintiff's statements and responses pursuant to Local Civil Rule 56.1.  In deciding the present motion for summary judgment, the Court will deem admitted facts in the defendant's Rule 56.1 statement which were not denied by the plaintiff and are supported by the record.  Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party.")  Mount Sinai's motion to strike is otherwise denied.  Separately, the Court notes that plaintiff submitted "corrected" versions of her brief in opposition to Mount Sinai's motion for summary judgment, the declaration of Kathleen Mullinix, and her Rule 56.1 statement.  The Court considers only the "corrected" versions of these documents in addressing the motion for summary judgment.

Mount Sinai to the public while ensuring a consistent revenue stream to support the ongoing innovative efforts of Mount Sinai's faculty and staff."  (Pl. 56.1 ¶ 1; Mair Decl. Ex. 11.)

In 2009, Mount Sinai hired Mullinix, then 65, as Associate Director for Business Development in the OTBD, one of three associate directors reporting to Dr. Patrick McGrath. (Pl. 56.1 ¶¶ 2, 7.)  Mullinix was not provided with an employment contract for her position as Associate Director, but she did receive an offer letter that confirmed the terms of the position, which included an annual salary of $165,000 per year and a $10,000 signing bonus.  (Def. 56.1 ¶¶ 4; Pl. 56.1 ¶ 3-4.)  McGrath, then the OTBD Executive Director, Dr. Dennis Charney, Dean of Mount Sinai, and Dr. Bonnie Davis, Chairman of the Technology Transfer Committee of the Board of Trustees interviewed Mullinix prior to her hire.  (Pl. 56.1 ¶ 5.)  McGrath was the hiring manager responsible for the decision to hire Mullinix, and Charney approved Mullinix's hire. (Def. 56.1 ¶ 6; Pl. 56.1 ¶ 6.)

II.  Mullinix Replaces McGrath as Director

In 2009, Bonnie Davis informed Charney and Dr. Kenneth Davis, the President and CEO of Mount Sinai Medical Center that OTBD was underperforming compared to other institutions regarding the number of technology disclosures, patent applications, patents granted, licenses, research agreements, royalty income and companies spun off.  (Pl. 56.1 ¶ 8.)  Charney was concerned about shortcomings in McGrath's leadership and interactions with faculty members and potential business partners.  He also believed that McGrath had not adequately educated the faculty on issues related to intellectual property and commercialization of science. (Def. 56.1 ¶ 9; Pl. 56.1 ¶ 9; Plevan Decl. Ex. 6 at 21-24.)  Mullinix noted that the OTBD lacked leadership, training, financial controls, team spirit, or a concrete strategy to evaluate and address the OTBD's significant costs to maintain its large portfolio of patent applications.  (Pl. 56.1 ¶ 15.)

- 3 -

Charney, in concurrence with Ken Davis, President and CEO of Mount Sinai (who gave Charney much discretion), decided to remove McGrath as the OTBD Director.  (Pl. 56.1 ¶ 10.)  In early July 2010, Charney informed Mullinix of his decision to terminate McGrath and asked Mullinix to become the interim Director of OTBD.  Mullinix informed Charney that the term "interim" in her title would diminish her authority and that she was uninterested in accepting the position of interim director.  (Pl. 56.1 ¶ 16; Plevan Decl. Ex. 2 at 37.)  Charney informed Mullinix a few weeks later that she would become OTBD Director and that she would receive a significant salary increase.  (Pl. 56.1 ¶ 17.)  Mullinix and Jeff Silberstein, Mount Sinai's Dean for Operations and COO and CAO of the Mount Sinai Medical Center, negotiated her contract.  (Pl. 56.1 ¶ 19.)

Charney, who had autonomy regarding personnel decisions, decided to conduct a search for a new position, Vice President of the OTBD ("VP, OTBD").  (Pl. 56.1 ¶¶ 12.)  The VP, OTBD would have overall responsibility for the OTBD, replace McGrath as head of the OTBD, and the OTBD director would report to the VP, OTBD.  (Mair Decl. Ex. 4 at 59-60.)  Charney informed Mullinix that Mount Sinai was going to create a VP, OTBD position and that an executive search firm would be hired to conduct the search for that position.  Mullinix stated that she wanted to be considered for the VP, OTBD position.  (Pl. 56.1 ¶ 20.)  Charney informed Silberstein about the VP, OTBD position after he told Silberstein to negotiate a contract with Mullinix.  (Pl. 56.1 ¶ 182.)

Silberstein found the negotiations with Mullinix "unusually difficult" and "very circular."  (Plevan Decl. Ex. 4 at 86-87.)  Mullinix insisted on being paid severance if she were to be terminated without cause during the initial two-year term of her contract.  Silberstein informed Charney that he found Mullinix very difficult to deal with and that she was making

demands regarding severance benefits and language changes that he considered unreasonable. (Plevan Decl. Ex. 4 at 92-97.)  Mullinix noted to Silberstein in an email dated September 28, 2010 that the "back and forth" in their negotiation "does not wear well, to put it mildly."  (Pl. 56.1 ¶ 26.)  Silberstein found Mullinix's email "rude" because he believed that Mullinix had created the animosity in their negotiations.  (Def. 56.1 ¶ 27; Pl. 56.1 ¶ 27.)

Silberstein understood that Mullinix would assume the role of director for a limited duration because Charney planned to search for a VP, OTBD.  (Pl. 56.1 ¶ 178.)  On September 29, 2010, Silberstein emailed Charney asking whether Charney would agree to Mullinix's request that Mount Sinai guarantee her compensation for a full two years and a minimum of six months of severance if she were terminated without cause.  Silberstein noted in the email that Mullinix's "behavior and tone" during the negotiations had been "questionable at best" and that her conduct "doesn't bode well for the marriage."  (Def. 56.1 ¶ 28; Pl. 56.1 ¶ 28; Plevan Decl. Ex. 16.)  Silberstein initially offered Mullinix a base salary of $225,000 and a 10% bonus.  (Pl. 56.1 ¶ 23.)  Charney agreed to a two-year contract, a $250,000 salary, and a minimum of six months of severance if she was terminated without cause during the term of the contract, stating in an email that "we need her and it may take time to recruit a new chief and get that person started," and directed Silberstein to include such language in a revised contract. (Def. 56.1 ¶¶ 24, 29; Pl. 56.1 ¶¶ 24, 29; Plevan Decl. Ex. 16.)

Mullinix executed a two-year employment contract with an "Initial Term" of July 12, 2010 through July 11, 2012, which provided that Mullinix would be a candidate for the VP, OTBD position.  (Pl. 56.1 ¶¶ 30-31.)  The contract also provided that Mullinix was eligible to receive severance benefits if she ceased to hold the OTBD Director position "by reason of Mount Sinai's termination of [her] employment of such position during the Initial Term" and that if

Mullinix became eligible for any severance "as a condition of receiving such amounts, you shall execute and agree to be bound by a waiver and general release of any and all claims arising out of or relating to your employment with Mount Sinai and termination thereof in such form as may be required by Mount Sinai." (Pl. 56.1 ¶ 32; Plevan Decl. Ex. 17 at D00098, D00099.) Charney refused Mullinix's request for an internal announcement to be issued regarding her appointment as director. (Pl. 56.1 ¶ 180.)

Mullinix reported to Charney until June 1, 2011. (Pl. 56.1 ¶ 33.) Charney rated Mullinix's performance as "Exceeds Expectations" in December 2010 and later noted that he found that Mullinix's performance exceeded expectations throughout the entire period she reported directly to him. (Pl. 56.1 ¶ 35.) However, during Mullinix's meetings with Charney, Mullinix made negative statements about some faculty members, including Dr. Peter Palese and Dr. Robert Desnick. Charney was concerned about the intensity and negativity of Mullinix's feelings, as it was important for Mullinix to maintain positive relationships with faculty, and informed Ken Davis that Mullinix had difficulties working with certain faculty members.[2] These faculty members were generally viewed as difficult to work with. Charney removed Desnick from his position as the Chairman of the Department of Human Genetics in late 2011 or early 2012, and Charney and Ken Davis admitted that they did not trust Desnick. (Def. 56.1 ¶¶ 36-37; Pl. 56.1 ¶¶ 34, 36-37.)

---

[2] Mullinix "may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (quoting First National Bank of Arizona v. Cities Services Co., 391 U.S. 253, 288 (1968)) (omission in original). Those specific facts must be supported by "citing to particular parts of materials in the record," Rule 56(c)(1)(A), Fed. R. Civ. P. Mullinix denies that Charney informed Ken Davis that Mullinix had problems working with some faculty members. (Pl. 56.1 ¶ 37.) The denial does not dispute that the statement was made, but refers the Court to Mullinix's responses to Mount Sinai's 56.1 ¶¶ 35-36. These statements do not refute that Charney reported to Davis that Mullinix was having issues with certain faculty members. Where Mullinix's denials are unsupported by materials in the record, the Court will deem facts set forth by Mount Sinai as undisputed. Local Civil Rule 56.1(d).

III. <u>VP, OTBD Search</u>

Mount Sinai retained an executive search firm led by Sean McCooe to identify candidates for the VP, OTBD position.  (Pl. 56.1 ¶ 38.)  Mount Sinai approved a job description for the VP, OTBD position created by McCooe.  The description stated that the position required "15+ year's business experience, including significant personal participation with the leadership of one or more life science-based businesses."  (Pl. 56.1 ¶ 39; Mair Decl. Ex. 31 at D00117.)  Silberstein orchestrated the search process.  (Pl. 56.1 ¶ 40.)  Charney and Ken Davis told Silberstein that Mullinix would be a candidate for the VP, OTBD position, and Silberstein informed McCooe to include her as a candidate.  (Pl. 56.1 ¶¶ 41-42.)  McCooe met with Silberstein, Charney, Ken Davis, Bonnie Davis, and a number of faculty members regarding the search.  (Pl. 56.1 ¶¶ 43-44.)  McCooe stated at his deposition that faculty members informed him that Mullinix was "not representing them well" and they preferred not to work with her. (Def. 56.1 ¶ 45; Pl. 56.1 ¶ 45.)[3]

McCooe considered more than 80 candidates for the VP, OTBD position.  (Pl. 56.1 ¶ 51.)  McCooe's notes from his October 15, 2011 interview with another candidate interviewed for the VP position at Mount Sinai, state "Kathleen mid 60's to Retire."  (Pl. 56.1 ¶ 186.)  In November 2010, Mullinix met with McCooe at a coffee shop in Manhattan.  (Pl. 56.1 ¶ 52.)  Mullinix felt that McCooe was uninterested in discussing her candidacy or her credentials. (Mullinix Decl. ¶ 10.)  In December 2010, Mullinix asked Charney about the status of the VP, OTBD search.  Charney informed Mullinix that McCooe had said that Mullinix did not want to be a candidate for the position.  (Pl. 56.1 ¶ 54.)  On December 22, 2010, Mullinix emailed Charney stating that she had spoken with McCooe and that they had concluded that "there was

---

[3] Mullinix states that this is an accurate account of McCooe's deposition testimony, but that McCooe's deposition testimony is generally not credible.  (Pl. 56.1 ¶ 45.)

some misunderstanding concerning my wish to be considered for the Vice President, Technology and Business Development position." (Pl. 56.1 ¶ 55.) Upon receipt of that email, McCooe's office manager, Liz Lavin, emailed McCooe and stated, "I didn't think they were interested in her for the VP role." (Pl. 56.1 ¶ 197.) After receiving Mullinix's December 22, 2010 email, Charney and Silberstein told McCooe to "do a good interview with Dr. Kathleen Mullinix." (Pl. 56.1 ¶ 198; Mair Decl. Ex. 5 at 138.)

Mullinix was not listed on any monthly reports reflecting the status of candidates considered in the VP search process until January 2011. (Pl. 56.1 ¶ 196.) Charney and McCooe did not contact references provided by Mullinix. (Pl. 56.1 ¶ 203.)

On January 18, McCooe met again with Mullinix regarding the VP, OTBD position and he sent Silberstein comments about the interview. (Pl. 56.1 ¶ 56.) Ken Davis and Charney interviewed six candidates, including Mullinix, for the VP, OTBD position. (Pl. 56.1 ¶ 47.) On January 20 and 21, 2011, Ken Davis, Charney, and faculty members Dr. Ross Cagan and Dr. Roger Hajjar interviewed Mullinix. (Pl. 56.1 ¶ 57.)

Ken Davis believed that Mullinix was a viable candidate for the VP, OTBD position because she had done an adequate job leading the OTBD since July 2010. However, he also felt that Mullinix had not created a "user friendly" office, which he believed to be important to a successful OTBD. At the time of these interviews, Charney had informed McCooe that he had decided that Mullinix would be interviewed, but would not get the VP job. (Def. 56.1 ¶ 59; Pl. 56.1 ¶ 59.)[4]

---

[4] Mullinix denies the statement that Ken Davis believed that Mullinix was a viable candidate. However, she provides no relevant evidence to refute that fact, and instead responds that Charney had determined that Mullinix would not get the job, which does not refute Mount Sinai's statement as to Ken Davis' thinking. (Def. 56.1 ¶ 59; Pl. 56.1 ¶ 59.)

Mullinix alleges that at a Dean's Leadership meeting in March 2011, Charney stated that he was excited about the VP, OTBD search and that "I am looking for a more youthful approach.  This office is going to be different."  (Pl. 56.1 ¶ 161; Mair Decl. Ex. 4 at 148-49.)

Teri Willey was the Chief Executive of Cambridge Enterprise Limited ("Cambridge"), a subsidiary of the University of Cambridge, responsible for the commercialization of technology arising from Cambridge University faculty.  As will be discussed, she was the successful candidate for the VP, OTBD position.  She was 51 years old when she was appointed VP, OTBD of Mount Sinai.  (Pl. 56.1 ¶¶ 61, 191.)  Prior to Cambridge, Willey was Vice President of the technology transfer arm of the University of Chicago and the Managing Partner of an early stage venture fund focused on investing in spinouts from University technology transfer programs.  Willey had also worked in the technology transfer offices at Northwestern University and Purdue University and had served as the President of the Association of University Technology Managers ("AUTM").  (Pl. 56.1 ¶ 62.)  For approximately one year, Willey served part-time as the director of business development at Endocyte, a biotech company that develops therapeutic targeting products.  (Def. 56.1 ¶ 63; Pl. 56.1 ¶ 63.)  Willey also served as a director of Rubicon Genomics and Nephryx, Inc., but she did not have "specific operational duties" at Rubicon and did not have "specific responsibilities for operational issues" at Nephryx.  (Def. 56.1 ¶ 63; Pl. 56.1 ¶ 63.)

McCooe contacted Willey in October 2010, and she expressed interest in the VP, OTBD position.  (Pl. 56.1 ¶ 64.)  Silberstein received materials on Willey, including a reference from Dr. Michael Cleare, Associate Vice Provost for Research & Executive Director for Technology Transfer at the University of Pennsylvania.  Dr. Cleare told McCooe that Willey

"has all the requisite experience and has proven self-skillful and political with administration and faculty." (Pl. 56.1 ¶¶ 65-66.) Charney and Ken Davis interviewed Willey because of her strong background, including her experience at Cambridge and AUTM. (Pl. 56.1 ¶ 67.) Ken Davis was "overwhelmed" by Willey's credentials and through that she could be a "superstar." (Pl. 56.1 ¶ 68.) On January 26 and 27, Willey interviewed with Silberstein, Ken Davis, Charney, Hajjar, Cagan, Robert Desnick and Michael McDonald, Mount Sinai's General Counsel; she made a well-received presentation to a group of faculty members, and also met with Mullinix. (Pl. 56.1 ¶¶ 69-70.)

After meeting with Willey, Mullinix described Willey as an "excellent self-promoter" in an email to McGrath. She noted that "she'll probably get the job in any event – I can see how they would fall for her starting company routine (she's not started anything with venture money). I'm feeling very forlorn at this point." (Pl. 56.1 ¶ 71.)

McCooe sent additional references regarding Willey to Silberstein, including one provided by Dr. Kathy Ku, Director and Office of Technology Commercialization at Stanford University, who "highly recommend[ed]" Willey; one provided by Dr. Richard Jennings, Deputy Director of Cambridge, who described Willey's ability to "get collective support across the university at the highest levels and with the highest respect" as "jaw-dropping" and noted that the Cambridge program was being replicated at other institutions, including Oxford and the Royal Academy of Medicine. Other references described Willey as "the best technology transfer person in the UK" and having "great connections" on the east coast and throughout the United States. (Pl. 56.1 ¶¶ 73-76.)

Silberstein told Charney that he thought that Willey was the best candidate for the VP, OTBD position and informed Ken Davis that Willey would be a "perfect fit" for Mount

Sinai.  (Pl. 56.1 ¶ 77.)  Hajjar informed Mullinix that she had his vote based on her work as

Director of OTBD.  (Pl. 56.1 ¶ 78.)  Charney hired Willey as VP, OTBD.  (Pl. 56.1 ¶ 80.)

IV. <u>Willey Joins OTBD</u>

Willey accepted Mount Sinai's offer, extended by Charney and began

employment with Mount Sinai on June 1, 2011.  Willey initially worked part-time at Mount

Sinai until she completed the transition of her duties at Cambridge.  (Pl. 56.1 ¶ 81.)  Mullinix

began reporting to Willey in June 2011.  (Pl. 56.1 ¶ 82.)  After Willey was hired, Charney

informed her that Mullinix had successfully reorganized the OTBD and encouraged Willey to

coordinate closely with Mullinix.  (Def. 56.1 ¶ 83; Pl. 56.1 ¶ 83.)  Willey, Ken Davis, and

Bonnie Davis understood Mullinix to be an interim director, in charge of OTBD only until

Willey was appointed Vice President.  (Pl. 56.1 ¶¶ 18, 82.)

Willey thought that Mullinix was uncooperative with counterparts in Mount Sinai

including facilities personnel, the associate dean for grants and contracts, the general counsel,

office staff members, and administrative assistants.  Soon after her hire, Willey received

complaints from faculty members and staff regarding Mullinix's work performance and

demeanor and observed that Mullinix was "antagonistic" and "abrasive."  Willey also believed

that Mullinix took an overly aggressive approach towards negotiating agreements.  (Def. 56.1 ¶

84-86, 88-90; Pl. 56.1 ¶ 84-86, 88-90.)

Rama Iyengar, the Associate Dean for Planning and Resource Management, made

recommendations to Charney regarding office space, facilities, and other resources which were

important to the OTBD's day-to-day operations.  In March 2011, Mullinix and Robert Hellauer

began to work with facilities personnel to identify, design, and develop a new office space for

OTBD.  After Willey's arrival, Iyengar informed Willey that OTBD would be situated in a

smaller office space than the planned space.  (Pl. 56.1 ¶ 91-92.)  In response, on June 28, 2011,

Mullinix mistakenly sent an email highly critical of Iyengar to Iyengar when she intended to send the email to Willey, who was not informed of the negotiations regarding the planned space. Willey believed that Mullinix made an honest error, and Mullinix apologized.  Willey responded, "[o]ops and thanks for the quick follow up note. . . . If this is the most awkward thing we have to deal with, we're fine."  (Pl. 56.1 ¶ 91-92.)  Willey convinced Charney that OTBD needed the original, larger space.  (Pl. 56.1 ¶ 92.)  Iyengar asked Willey not to include Mullinix in any further matters regarding facilities and office space.  (Pl. 56.1 ¶ 93.)

On August 5, 2011, Mullinix sent an email to Jessica Moise, the Associate Dean responsible for grants and contracts, which was intended for Willey and concerned Moise. Mullinix criticized Moise and noted that she had offended a colleague.  Willey believed that Mullinix had made a genuine mistake when she sent the email to Moise.  (Pl. 56.1 ¶ 94.)  Moise managed approximately $300 million worth of sponsored money.  (Pl. 56.1 ¶ 95.)

In March 2011, Mullinix negotiated an agreement between Mount Sinai and Roche in collaboration with Dr. Peter Palese, Dr. Adolfo Garcia-Sastre, and Charney.  In August 2011, Sastre and Palese asked Mullinix if she had received a draft agreement from Roche, and she stated that she had not received a draft agreement when she had received a draft.  Palese discovered that Mullinix had a copy of the agreement and complained to Willey about Mullinix's conduct.  Mullinix did not disclose the draft to the faculty members because Roche business development protocol provided that draft agreements were not shared with scientists.  (Def. 56.1 ¶ 98-99; Pl. 56.1 ¶ 98-99.)  Willey apologized to Palese, Sastre, and Charney for Mullinix's purported dishonesty, and suggested that Willey take charge of the Roche negotiations.  In a separate email to Mullinix, Willey was very sympathetic about the position Mullinix had been

placed in, and stated that she was "sharing [Mullinix's] frustration.  (Def. 56.1 ¶ 100; Pl. 56.1 ¶

100.)  Palese thanked Willey for "taking charge of the Roche contract."  He stated,

> Without spending more time on Kathy Mullinix's inability to lead
> these negotiations and the fact that she lied to us about having a
> document from Roche in her hands, it is important to state that we
> (the scientists) initiated the deal and pushed it along WITHOUT
> any help from Kathy.  In contrast, at every step of the negotiations
> she unnecessarily delayed the process and tried to keep us (the
> scientists) out of the picture.  WHY?  We do not trust her anymore!

(Plevan Decl. Ex. 33.)  Mullinix continued to lead the negotiations with Roche, which resulted in

a positive deal for Mount Sinai, pleasing Palese.  In her December 2011 written support for a

bonus for Mullinix, Willey praised Mullinix's work on the Roche deal.  Palese eventually praised

Mullinix's work and gave her a book as a gift in March 2012.  (Def. 56.1 ¶ 101; Pl. 56.1 ¶ 101.)

In 2011, Eric Vieira, an OTBD Assistant Director, entered into discussions with

Population Diagnostics, Inc. ("PDX"), whereby Dr. Hugh Sampson, Dean for Translational

Biomedical Research, would provide patient samples to PDX that PDX would use to develop

diagnostics for food allergies.  (Pl. 56.1 ¶ 104.)  Mullinix supervised Vieira's handling of the

PDX negotiations.  (Pl. 56.1 ¶ 105.)  In December 2011, Mullinix attended a meeting with

Vieira, Michael Phillips, Jim Chinitz, PDX's CEO, and Mr. Chinitz's attorney.  At the meeting,

Chinitz refused to provide information about his business or his investors, demanded provisions

in conflict with Mount Sinai's core principles concerning agreements, and demanded that

Sampson conduct work at Mount Sinai's expense.  Mullinix and Vieira agreed to all of his

demands except one and agreed to provide language on the outstanding provision to which both

parties could agree.  (Pl. 56.1 ¶ 106.)

After the meeting, Chinitz stated in an email to Sampson that "unless you are able

to change the academic/industry partnering philosophy of your licensing group, we've realized

that it makes no further sense to continue our negotiations with them." (Pl. 56.1 ¶ 107.) Sampson forwarded Chinitz's email to Viera, Mullinix and Willey and stated that he was "flabbergasted at the outcome of this negotiation." (Pl. 56.1 ¶ 108.) Mullinix forwarded Sampson's email to Willey and blamed Chinitz for the outcome, stating that Chinitz's email "has no connection with reality." (Pl. 56.1 ¶ 109.) In an email to Mullinix, Willey observed that "negotiations are a battle for you and not a partnering exercise." (Plevan Decl. Ex. 38.) Willey admitted at her deposition that she believed the version of events provided by Vieira and Mullinix, noted that she had no disagreement with their substantive approach, and agreed that they sought the set of terms that Mount Sinai would prefer. (Pl. 56.1 ¶ 109.) Willey believed that Mullinix chose to blame Chinitz for the failed negotiation rather than responding to Sampson's concerns with a "solutions-oriented" approach, but apologized to Mullinix in an email for "jumping to conclusions." (Def. 56.1 ¶ 110; Pl. 56.1 ¶ 110.) Willey took over the negotiations and informed Charney that she planned to lead. The deal concluded with terms disadvantageous to Mount Sinai and informed Charney that she would lead the negotiations. (Def. 56.1 ¶ 111; Pl. 56.1 ¶¶ 111-12.)

Willey believed that Mullinix was "often dismissive and derogatory in her comments about faculty" to Willey and other members of the OTBD staff. (Def. 56.1 ¶ 113; Pl. 56.1 ¶ 113.) She also thought that Mullinix was unnecessarily dismissive of Dr. Ravi Iyengar's ideas about commercializing technology and a potential partnership between Dr. Carlos Cordon-Cardo and Celgene, a multinational biopharmaceutical company. (Def. 56.1 ¶ 114; Pl. 56.1 ¶ 114.) Willey also believed that Mullinix was dismissive towards Palese and Megan Shaw, a member of Palese's team, although Mullinix mentored Shaw in 2011. (Def. 56.1 ¶ 115; Pl. 56.1 ¶ 115.)

On December 11, 2011, Mullinix emailed Willey her self-evaluation. Mullinix had awarded herself the highest possible rating for each performance category. (Pl. 56.1 ¶ 116.) Willey did not agree with the ratings contained in Mullinix's self-evaluation and she prepared notes for a discussion with Mullinix regarding her performance. (Def. 56.1 ¶ 117; Pl. 56.1 ¶ 117; Plevan Decl. Ex. 41.) Willey believed that Mullinix needed to improve her performance in certain areas, including her attitude, respect, teamwork, and customer service orientation towards the faculty. (Def. 56.1 ¶ 118; Pl. 56.1 ¶ 118.) On December 16, 2011, Willey and Mullinix met in Willey's office to discuss Mullinix's performance. During the meeting, Willey discussed Mullinix's self-evaluation and pointed out to her where Willey's evaluation differed. (Pl. 56.1 ¶ 120.) Willey informed Mullinix that she needed to emphasize increasing transactions and partnering as opposed to over-negotiating deals. Willey and Mullinix also discussed the difference between Mullinix's self-evaluation ratings and Willey's ratings. Willey believed that Mullinix needed improvement regarding her compassion, attitude, respect and teamwork. At the end of the meeting, after a discussion of these issues, Willey agreed to raise the ratings she had given Mullinix in those areas. (Def. 56.1 ¶ 121; Pl. 56.1 ¶ 121.) At her deposition, Willey noted that she "w[]imped out" and "wasn't as bold as [she] should have been in expressing the areas that needed additional interest through the rating scores." (Plevan Decl. Ex. 3 at 127.) Willey's memorandum praised Mullinix's 2011 performance and recommended a 20% bonus, while her contract called for a 10% bonus. (Mair Decl. Ex. 19, 32.) Willey also complimented Mullinix's leadership of the OTBD, stating that "OTBD staff . . . appreciate and feel empowered by Dr. Mullinix's leadership in the office, which has been critical." (Pl. 56.1 ¶ 89.)

On January 4, 2012, Willey responded to an email from Mullinix regarding Mullinix's contract, stating that "Caryn explained that we can renew or extend the contract or

continue without one.  But I expect it is better to have a contract."  (Mair Decl. Ex. 21.)  In mid-

January 2012, Willey informed Mullinix that she planned to recommend to Charney that Mount

Sinai renew Mullinix's employment contract.  (Mullinix Decl. ¶ 15.)  On February 10, Willey

emailed Scott Friedman, and stated, "I would like to talk with you about Kathy's role as

Director.  It is coming time to make a proposal to extend her contract (it expires this summer)

and I would value your input as I put the proposal for the extension together."  (Mair Decl. Ex.

22.)

> In an email sent to Sean McCooe on February 27, 2012, Willey wrote,
>
> As much as I respect KM and appreciate her excellent ideas,
> working with her is a misery and I'm increasingly frustrated in part
> because it is so hard to articulate why but perhaps it is: she is a
> Director that isn't aware and doesn't seem to ca[r]e about licenses
> and sponsored research agreements (uses the excuse that
> everything is a mess and it is only worth doing big deals and but
> she's been there since 2009 and during her time as interim and
> director we've done virtually no licensing), looks for ways to stop
> and slow down deals instead of ways to support the faculty, do the
> deal and preserve the relationship with both parties, is constantly
> raising issues as to why something shouldn't happen but doesn't
> propose how to mitigate the problem, most of my case load is a
> result of faculty or company representatives who refuse to work
> with her.  She hired Bob Hellauer and he is a god send so I am
> grateful to her for that.  And she has a nose for what is valuable but
> can't implement anything to save her life.  It's just painful and I
> expect the new Dean and I will be searching for someone to
> replace her but I am going to leave the decision to him as the
> Director of OTBD will be reporting to him and they may hit it off
> just fine.  In the meantime I'm trying to make it work and I think
> she is too but it is horrible.

(Mair Decl. Ex. 62 at 4153.)

On February 28, 2012, the Technology Transfer Committee of the Board of

Trustees met for a status report on OTBD activities.  (Pl. 56.1 ¶ 123.)  At this meeting, Dr. Scott

Friedman was introduced as the new Dean for Therapeutic Discovery to whom Willey would

report.  (Pl. 56.1 ¶ 124.)  Mullinix and Hellauer presented at the meeting.  Willey was scheduled

to conclude the discussion.  (Pl. 56.1 ¶ 125.)  Due to the length of Mullinix's presentation and

the level of audience participation by the trustees in response to Mullinix's presentation, Hellauer

did not complete his presentation and Willey was unable to make any presentation.  (Def. 56.1 ¶

126; Pl. 56.1 ¶ 126.)  Friedman emailed Willey and stated that "I thought your team did an

excellent job today and was delighted to be there to see it."  (Pl. 56.1 ¶ 127.)  After the meeting,

Willey noted that Mullinix's presentation was "very good" and "well-received."  Willey also

informed Mullinix that she believed that Mullinix had "hijacked" the presentation for her own

self-promotion.  (Def. 56.1 ¶ 127; Pl. 56.1 ¶ 127; Plevan Decl. Ex. 43.)

V.  <u>Mullinix's Contract Is Not Renewed</u>

On March 1, 2012, Willey emailed Caryn Tiger-Paillex, the Mount Sinai Director

of Human Resources, and Silberstein, informing them that she decided not to continue Dr.

Mullinix's contract and to commence with a search for a Director of the OTBD.  She noted that

she wanted to plan "next steps," including discussions with Charney, Bonnie Davis, and Scott

Friedman (and noted that she had already discussed the decision with Ken Davis), interim

director arrangements, and launching the search for a new Director.  (Plevan Decl. Ex. 45.)

Mullinix responded to Willey by email on March 2, 2012, after the decision was

made to remove her from the director position on March 1, 2012.  (Pl. 56.1 ¶ 128.)  In a letter

attached to her email, Mullinix accused Willey of unprofessional, untruthful, and "destructive"

behavior and described Willey's perception of her conduct at the Board meeting as "absurd" and

"preposterous."  (Pl. 56.1 ¶ 129.)  Mullinix believed that Willey had directed her "anger" and

"criticisms" regarding the OTBD's performance towards Mullinix.  (Pl. 56.1 ¶ 130.)

Willey believed Mullinix had aggravated relationships with faculty and potential

business partners, hindering her ability to successfully work with faculty and staff.  (Def. 56.1 ¶

133; Pl. 56.1 ¶ 133.)  By March 2012, Willey no longer wanted to "put the time and effort into damage control" arising from Mullinix's difficulties with colleagues.  (Def. 56.1 ¶ 135; Pl. 56.1 ¶ 135.)  Charney was unsurprised when Willey informed him that she and Mullinix struggled to work together effectively because he had received complaints from faculty members about Mullinix's personal interactions with faculty, although he could not recall specific faculty complaints.  (Def. 56.1 ¶ 137; Pl. 56.1 ¶ 137.)

On March 7, 2012, Willey sent Tiger-Paillex talking points that she had prepared for a meeting with Mullinix, at which she informed Mullinix that her contract would not be renewed.  The talking points stated that it was "critical that the director of the office be comfortable in collaborating with counterparts within the institution (Grants and Contracts Office, General Counsel's Office, Clinical Trials Office, etc) as part of the team and above all be customer service oriented in support of our research faculty" and that "[t]hese are aspects of the role that are uncomfortable for [Mullinix] and it seems to me are in fact painful for [Mullinix] to engage in."  (Pl. 56.1 ¶ 138.)  On March 8, 2012, Willey told Mullinix that Mount Sinai would not renew Mullinix's contract as OTBD Director upon its expiration in July 2012 because Mullinix was "not sufficiently congenial with faculty," but Willey told Mullinix that she would consider a different role for Mullinix at Mount Sinai.  (Pl. 56.1 ¶ 139.)

Mullinix proposed alternative roles for herself at Mount Sinai to Friedman, and met with him to discuss her proposal.  She informed Friedman that she wanted to report directly to him.  (Pl. 56.1 ¶¶ 140-41.)  Friedman informed Mullinix that she could not report to him because it would undercut Willey's authority.  (Pl. 56.1 ¶ 142.)  Willey thought that Mullinix's suggestions were positive examples.  (Pl. 56.1 ¶ 224.)  Mullinix did not have any further conversations with Friedman about a potential role at Mount Sinai.  (Pl. 56.1 ¶ 143.)

VI. <u>Mullinix Released from Directorial Duties</u>

On March 21, Willey suggested an alternative role for Mullinix in an email to Scott Friedman.  (Pl. 56.1 ¶ 225; Mair Decl. Ex. 27.)  On March 22, after meeting with Mullinix, Willey stated in an email to Tiger-Paillex that Mullinix "lashed out a bit" and "seemed very angry especially about the prospect of not Directing Blue Mountain."  Willey noted that she had told Mullinix in that meeting that she could continue to use the title of Director.  (Mair Decl. Ex. 28.)  In a subsequent email to Tiger-Paillex, Willey noted that she "met with the Dean at 3:00.  After talking to him it is clear that I should take steps to end Kathy's engagement in the office now instead of having it play out through to the end of her contract.  I need to act on this and need your advice."  (Mair Decl. Ex. 28.)

On March 28, Friedman emailed Willey to report feedback from faculty members regarding difficulties working with Mullinix and that he was comfortable with Willey's decision not to renew Mullinix's contract.  Friedman further stated that he believed that Mullinix was "quite angry" and "may not be able to get past it sufficiently to serve a constructive role."  Friedman noted that he made clear to Mullinix that any future role at Mount Sinai would require her to report to Willey.  (Pl. 56.1 ¶ 147.)

On April 10, 2012, Mullinix met with Willey and Silberstein.  Mullinix and Silberstein discussed the terms of a severance arrangement and Mullinix agreed that her last day of work in the office would be April 13, 2012.  (Pl. 56.1 ¶ 148.)  At that point, Mullinix noted that she was no longer functioning as director.  (Plevan Decl. Ex. 2 at 283.)  On April 13, 2012, Willey emailed Mullinix a release agreement.  (Pl. 56.1 ¶ 149.)  Although Mullinix would no longer be coming to the office, Silberstein understood that, based on her contract, Mullinix was still technically serving as Director of OTBD until she signed the release or her contract ended.  On May 15, 2012, Silberstein informed Mullinix by letter that

"You will remain in the position of Director of the Office of Technology and Business Development through July 11, 2012, your contract end date.  We had initially discussed that you would triage your emails, be available to staff, and generally transition your matters until your contract expires.  Subsequently, you told us that you preferred to stop working as of April 13, 2012.  To my knowledge you have not been involved in office matters to any significant degree or visited the office since April 13.  If you wish to continue in that fashion until July 11, that is acceptable to us.  Alternatively, you can assume a more active transition role until the end of the contract term, working as you did before April 13 from out of the office, monitoring emails and responding to staff inquiries.  Please let me know how you wish to proceed."

(Def. 56.1 ¶ 150; Pl. 56.1 ¶ 150; Mair Decl. Ex. 39.)  Mullinix's Mount Sinai email account was active after April 13, 2012.  On May 14, 2012, Mullinix responded to an email from Hellauer. (Pl. 56.1 ¶ 151.)  Mullinix remained on Mount Sinai's payroll through July 31, 2012.  (Pl. 56.1 ¶ 152.)

    VII.    Age-Related Information

    Willey, Ken Davis, Bonnie Davis, and Silberstein never made any age-related comments to Mullinix.  (Pl. 56.1 ¶¶ 153, 154, 156, 158.)  Except for a conversation that Mullinix had with Professor Fred Lublin about "how great it was that at our age we were still doing wonderfully exciting things" and the comment attributed to Charney, Mullinix never heard any Mount Sinai faculty members make any age-related comments.  (Pl. 56.1 ¶ 160.)

    Mullinix was 67 when Willey was hired for the VP, OTBD position.  (Pl. 56.1 ¶ 191.)  Charney was 59 when he hired 51 year-old Willey.  (Pl. 56.1 ¶¶ 162, 191.)  Ken Davis was 63 when Willey was selected for the VP, OTBD position (Pl. 56.1 ¶ 155.)  Bonnie Davis was 62 when Willey was selected for the Vice President position.  (Pl. 56.1 ¶ 157.)  Silberstein was 56 at the time Willey was selected for the Vice President position.  (Pl. 56.1 ¶ 159.)

LEGAL STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P. "The mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis in original). A factual dispute is material if it "might affect the outcome of the suit under the governing law." <u>Id.</u> at 248. A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u>

The moving party bears the burden of identifying matters that it believes demonstrate the absence of a genuine issue of material fact, <u>see</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986), and all reasonable inferences are drawn in favor of the nonmoving party, <u>see</u> <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986). In deciding the motion, the court may rely on "any material that would be admissible or usable at a trial." <u>Major League Baseball Properties, Inc. v. Salvino, Inc.</u>, 542 F.3d 290, 309 (2d Cir. 2008) (citation and quotation marks omitted); Rule 56(c)(2), Fed. R. Civ. P. However, "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . .'" <u>Anderson</u>, 447 U.S. at 225.

A court must exercise "an extra measure of caution" in determining whether to grant summary judgment against claims involving allegations of employment discrimination "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." <u>Schiano v. Quality Payroll Systems, Inc.</u>, 445 F.3d 597, 603 (2d

Cir. 2006) (citation omitted).  But, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."  Holcolmb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008).  "A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory or based on speculation."  Major League Baseball Properties, 542 F.3d at 310 (internal citation omitted).

Mullinix claims that the defendants failed to promote her and terminated her on the basis of her age in violation of the ADEA, the NYSHRL, and NYCHRL.

Mullinix alleges that the failure to promote and the termination were the result of unlawful age discrimination under the ADEA and the NYSHRL.  The ADEA makes it "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  This Court analyzes plaintiff's ADEA claim utilizing the McDonnell Douglas v. Green framework for discrimination claims as modified by the Supreme Court's holding in Gross v. FBL Financial Services, 557 U.S. 167 (2009).  See Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 105-06 (2d Cir. 2010).  To the extent that Mullinix seeks to invoke the NYSHRL in asserting a claim of age discrimination, this Court analyzes such allegations under the same McDonnell Douglas framework.  See Gorzynski, 596 F.3d at 106 n.6 ("The law governing ADEA claims has been held to be identical to that governing claims made under the NYHRL.").

McDonnell Douglas v. Green, 411 U.S. 792 (1973), articulates a three-step framework for analyzing discrimination claims.  The plaintiff bears the initial burden of establishing a prima facie case of discrimination.  See id. at 802-03.  Where the alleged discrimination was based on age, the plaintiff "must show (1) that she was within the protected

age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rice to an inference of discrimination." Gorzynski, 596 F.3d at 107. The plaintiff's burden in establishing a prima facie case is "not a heavy one." Id. (citing Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000)). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory basis for its actions. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). Assuming the defendant meets its burden, the burden shifts back to the plaintiff to prove that the reasons proffered by the defendant were merely pretextual. See Isaac v. City of N.Y., 701 F. Supp. 2d 477, 486 (S.D.N.Y. 2010) (citing Burdine, 450 U.S. at 253). In allegations of age discrimination under the ADEA, the plaintiff must prove by a preponderance of the evidence that his age was a "but for" cause for the defendant's adverse employment action. See Gorzynski, 596 F.3d at 106-07.

The First Department has recently held that "summary judgment dismissing a claim under the NYCHRL should not be granted unless the claim . . . fails when analyzed under the somewhat more lenient mixed-motive framework. . . . . [T]he plaintiff should prevail in an action under the NYCHRL if he or she proves that unlawful discrimination was one of the motivating factors, even if it was not the sole motivating factor, for an adverse employment decision." Melman v. Montefiore Medical Ctr., 98 A.D.3d 107, 126-27 (1st Dep't 2012). Melman requires trial courts to consider whether a plaintiff's claim could survive under either the McDonnell Douglas analysis or a mixed motives theory of liability. "While it is unclear whether McDonnell Douglas continues to apply to NYCHRL claims, and, if so, to what extent it applies, the question is also less important because the NYCHRL simplified the discrimination inquiry: the plaintiff need only show that her employer treated her less well, at least in part for a

discriminatory reason.  The employer may present evidence of its legitimate, non-discriminatory

motives to show the conduct was not caused by discrimination, but it is entitled to summary

judgment on this basis only if the record establishes as a matter of law that 'discrimination

play[ed] no role' in its actions."  Mihalik v. Credit Agricole Cheuvreux N.A., 715 F.3d 102, 110

n.8 (2d Cir. 2013) (quoting Williams v. N.Y.C. Housing Authority, 61 A.D.3d 62, 78 n.27 (1st

Dep't 2009).

> I.   Failure to Promote Mullinix

To establish a prima facie case of a discriminatory failure to promote, a plaintiff

ordinarily must demonstrate that: "(1) she is a member of a protected class; (2) she applied and

was qualified for a job for which the employer was seeking applicants; (3) she was rejected for

the position; and (4) the position remained open and the employer continued to see applicants

having the plaintiff's qualifications."  Petrosino v. Bell Atlantic, 385 F.3d 210, 226 (2d Cir.

2004).  The ADEA prohibits discrimination on the basis of age, and not solely on class

membership.  Accordingly, the fact that Willey, the candidate who was hired for the position, is

significantly younger than Mullinix is a reliable indicator of discrimination, even though Willey

was within the protected class at the time of her hire.  O'Connor v. Consolidated Coin Caterers

Corp., 517 U.S. 308, 312 (1996) ("The fact that one person in the protected class has lost out to

another person in the protected class is thus irrelevant, so long as he has lost out because of his

age.").  Because the defendant assumes, for purposes of this motion, that plaintiff has established

a prima facie case of age-based discrimination, the Court assumes without deciding that plaintiff

has established a prima facie case of age-based discrimination.

The burden thus shifts to the defendant to proffer a legitimate, nondiscriminatory

reason for failing to promote Mullinix.  This burden is "one of production, not persuasion," and

thus involves "no credibility assessment" by the Court.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).

Mount Sinai has offered a legitimate and non-discriminatory reason for not promoting Mullinix.  Specifically, the defendants have produced evidence that Teri Willey was a qualified candidate for the position, who they believed had great success as the director of the technology transfer office at the University of Cambridge.  Willey's references emphasized her strengths in interactions with faculty and administration.  Charney and Ken Davis decided to interview Willey for the VP, OTBD position because of her strong background, including her work as the past president of AUTM.  "An employer is entitled to arrive at a subjective evaluation of a candidate's suitability for a position."  Byrnie v. Town of Cromwell Board of Educ., 243 F.3d 93, 106 (2d Cir. 2001).  Mullinix contends that Willey did not have the requisite 15+ years of business experience required for the position.  Willey's role as director of business development at Endocyte, a biotech company that develops therapeutic targeting products, was a temporary, part-time role for about a year.  Additionally, Willey served on the board of directors of Rubicon Genomics and Nephrx, Inc., as well as other life science businesses.  Based on the totality of the evidence, Willey was a qualified candidate.

Accordingly, the presumption in favor of discrimination is erased and the burden now shifts back to Mullinix to prove that Mount Sinai's non-discriminatory reason was merely a pretext for age discrimination.  See Reeves, 530 U.S. at 143.  This burden on Mullinix is higher than that required to establish a prima facie case of discrimination; a plaintiff's "initially vague allegation of discrimination" must be "increasingly sharpened and focused" at the third stage of the McDonnell Douglas framework.  Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985).  To meet this burden, plaintiff must show "both that the [defendant's] reason was false and that

discrimination was the real reason." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515 (1993) (emphasis in original). A plaintiff does not prove liability unless "the protected trait (under the ADEA, age) actually motivated the employer's decision." Reeves, 530 U.S. at 141. A plaintiff claiming disparate treatment under the ADEA must prove by a preponderance of the evidence that age was the "but-for" cause of the adverse decision, not just a contributing or motivating factor. Gorzynski, 596 F.3d at 107 (citing Gross, 557 U.S. at 177).

Mullinix contends that her candidacy for the VP, OTBD position was a sham, because she was not listed on McCooe's candidate list, her references were not checked, her initial interview with McCooe was perfunctory, and Charney stated that the Mount Sinai faculty "will interview [Mullinix] but she will not get the job." These facts do not, alone, evince a discriminatory intent. Mullinix was an internal candidate, unlike the approximately 80 external candidates that applied for the position. Mullinix reported directly to Charney and met with him weekly from the time she was appointed director until Willey was appointed VP, OTBD. Charney had ample opportunity to observe and review her work. As a matter of business practice, internal and external candidates for a position are examined differently. No recommendation or reference could outweigh the power of directly observing Mullinix's performance. Mullinix was expected to maintain positive relationships with faculty members. In weekly meetings with Charney, Mullinix made negative statements about certain faculty members, which caused Charney concern. However, Charney also rated Mullinix's performance as "Exceeds Expectations" in December 2010, and admitted that her performance exceeded expectations the entire time he directly supervised her work. These facts alone would not permit a reasonable factfinder to find that Mullinix's age was the "but for" cause of her failure to get the position.

Considering the entirety of the record, including a comment made by Charney in March 2011, however, a reasonable jury could find that Mullinix's age was the "but for" cause of Mount Sinai's decision not to hire her as VP, OTBD.  In March 2011, Charney, referring to the VP, OTBD position, stated that "I am looking for a more youthful approach.  The office is going to be different."  Although "the stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination"  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001), "[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be."  Tomassi v. Insignia Financial Group, Inc., 478 F.3d 111, 115 (2d Cir. 2007).  "The relevance of discrimination-related remarks does not depend on their offensiveness, but rather on their tendency to show that the decision-maker was motivated by assumptions or attitudes related to the protected class."  Id. at 116.

> In determining whether a remark is probative, [courts in this circuit] have considered four factors: "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e. whether it was related to the decision-making process).  While we caution that none of these factors should be regarded as dispositive, we think this framework will often provide a useful approach to the admission or exclusion of remarks not directly related to the adverse action against the plaintiff, and employ it here.

Henry v. Wyeth Pharmaceuticals, Inc., 616 F.3d 134, 150 (2d Cir. 2010).  In this case, Charney, the decision-maker in selecting the VP, OTBD, made the remark in March 2011, after Mullinix and Willey had been interviewed.  The remark could be viewed by a reasonable jury as evidence of discriminatory intent, as Charney directly stated that he was seeking a "more youthful approach" in relation to the position for which Mullinix, who was the oldest candidate

interviewed for the position, had applied.  The context was related directly to the decision

process, as it was made when Charney updated Mount Sinai leadership about search for the VP,

OTBD.  Therefore, the remark is probative of discrimination.  Mount Sinai argues that the

remark is not evidence of discriminatory animus, citing Kosarin-Ritter v. Mrs. John L. Strong,

LLC, 117 A.D.3d 603, 604 (1st Dep't 2014).  In Kosarin-Ritter, the plaintiff complained about

multiple compliments made by the defendant, including one statement that the company was

"going young."  Unlike in that case, brought in state court and not evaluated under the factors set

forth in Henry, Charney's comment, evaluated under the Henry factors, would provide a

reasonable jury with evidence of discriminatory intent regarding the hiring of the new VP,

OTBD.

   Mount Sinai, invoking the "same actor" inference, argues that because Charney

approved Mullinix's hire at age 65 and promoted her, giving her a $100,000 raise one year later,

he could not have discriminatory animus such that he would not hire her because of her age.

Mullinix argues that her appointment as director was an interim position made under the false

pretense that it was a permanent position, and therefore, was not a promotion.  The same actor

inference arises from the rationale that "when the person who made the [adverse decision] was

the same person who made the decision to hire, it is difficult to impute to her an invidious

motivation that would be inconsistent with the decision to hire."  Grady v. Affiliated Central,

Inc., 130 F.3d 553, 560 (2d Cir. 1997).  Mullinix argues that McGrath, not Charney, hired her,

and therefore, the same actor inference is inappropriate.  It is undisputed that Charney approved

of Mullinix's hire, and also undisputed that Charney approved her $100,000 raise one year after

her hire, when she was appointed director.  Mullinix argues that her appointment was, in fact, an

"interim" appointment, and that she was not truly promoted.  The leadership at Mount Sinai

viewed Mullinix as an interim leader of OTBD until a VP, OTBD was appointed.  Mullinix remained Director of OTBD even after Willey was appointed the VP, OTBD, and Charney informed her at the time of her appointment as director that a VP, OTBD position was being created.  While Charney's approval of Mullinix's hire and promotion to director indicate that he may have lacked an invidious motivation, the short term of Mullinix's contract and his statement regarding the VP, OTBD position contradict that implication.  Accordingly, although Charney promoted Mullinix to director, Charney's other actions sufficiently outweigh the promotion so as to minimize the applicability of the "same actor" inference.

Mullinix also argues that a note written by Sean McCooe during the interview of a different for the VP, OTBD position, is probative of age bias by Mount Sinai.  McCooe's note states "Kathleen mid 60's to Retire."  McCooe, an outside recruiter, lacked decision-making power, as his decisions were largely directed by Silberstein and Charney.  The note was written in October 2010, during the course of an interview of another candidate for the position, indicating that it was made in reference to the employment decision in question.  However, "courts have consistently held that remarks relating to retirement or transition planning are insufficient to defeat a motion for summary judgment in an ADEA case."  Fried v. LVI Services, Inc., 10 Civ. 9308 (JSR), 2011 WL 4633985, at *9 (S.D.N.Y. 2011).  Reading the note in the context of the totality of the record, the Court concludes that the note, while alone insufficient to defeat summary judgment, is slightly probative of discrimination.  McCooe, a recruiter, made a specific finding that Mullinix would not be a serious candidate for the position because she was to retire – an understanding that he maintained when he interviewed Mullinix in November, despite her expressed wish to be a candidate for the position.

Mullinix has demonstrated that a reasonable jury, considering the totality of the evidence, could find that Mullinix was not hired as VP, OTBD on the basis of age discrimination.  A jury may very well find that Mount Sinai based its determinations on soft and subjective considerations and differences between the two candidates, and may find that Mullinix's interpersonal skills were less advantageous to Mount Sinai, but a jury may also find that Charney's statement that he was seeking a "more youthful approach" betrayed real intent to select a younger candidate on the basis of age.  This question is best answered by a jury. Accordingly, Mount Sinai's motion for summary judgment is denied as to Mount Sinai's decision not to promote Mullinix under the ADEA and the NYSHRL.  Additionally, because the record does not establish as a matter of law that "discrimination play[ed] no role' in its actions," Mihalik, 715 F.3d at 110 n.8, Mount Sinai's motion for summary judgment regarding its decision not to promote Mullinix under the NYCHRL is denied.

## II.  Termination

Because a plaintiff's burden in establishing a prima facie case of unlawful termination under the McDonnell Douglas framework is de minimis, Dister v. Continental Group, Inc., 859 F.2d 1108, 1115 (2d Cir. 1988), and because the defendant assumes for purposes of this motion that plaintiff has established a prima facie case of age-based discrimination, the Court assumes without deciding that plaintiff has established a prima facie case of age-based discrimination.

The burden thus shifts to the defendant to proffer a legitimate, nondiscriminatory reason for Mullinix's termination.  This burden is "one of production, not persuasion," and thus involves "no credibility assessment" by the Court.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).

Willey had criticized Mullinix's performance in certain areas involving teamwork, compassion, negotiation, and attitude.  Willey expressed frustration with her relationship with Mullinix in an email to McCooe dated February 27, 2012.  Willey informed Mullinix that she felt Mullinix had "hijacked" a presentation for her own self promotion.  On March 22, Willey determined that she would not offer Mullinix a continuing role in OTBD.  Mount Sinai has offered a legitimate and non-discriminatory reason for not renewing Mullinix's contract.

Accordingly, the presumption in favor of discrimination is erased and the burden now shifts back to Mullinix to prove that Mount Sinai's non-discriminatory reason was merely a pretext for age discrimination.  See Reeves, 530 U.S. at 143.  To meet this burden, plaintiff must show "both that the [defendant's] reason was false and that discrimination was the real reason." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515 (1993) (emphasis in original).  A plaintiff does not prove liability unless "the protected trait (under the ADEA, age) actually motivated the employer's decision."  Reeves, 530 U.S. at 141.  A plaintiff claiming disparate treatment under the ADEA must prove by a preponderance of the evidence that age was the "but-for" cause of the adverse decision, not just a contributing or motivating factor.  Gorzynski, 596 F.3d at 107 (citing Gross, 557 U.S. at 177).

Mullinix has not met that burden on her termination claim.  Mullinix argues that Charney made the decision not to renew her contract based on her age.  But no reasonable factfinder could find in Mullinix's favor on her termination claim.  Mullinix contends that because Willey intended to renew Mullinix's contract as of January 2012, the fact that she decided, in late February 2012, not to renew Mullinix's contract must have been because Charney instructed Willey not to renew Mullinix's contract due to her age.  However, the record

does not support such a conclusion.  On January 4 and February 10, 2012, Willey expressed in various emails that she intended to continue Mullinix's contract when it expired in July 2012. However, in an email on February 27, 2012, prior to the February 28, 2012 meeting, Willey relayed frustration in her working relationship with Mullinix, noting that "working with [Mullinix] is misery."

At a February 28, 2012 Technology Transfer Subcommittee of the Board of Trustees meeting, Mullinix's presentation exceeded the allotted time, due, in part, to extensive "audience participation" from the trustees.  As a result, another OTBD staffer had to cut his presentation short, and Willey, the VP, OTBD, was unable to present at all.  After the subcommittee meeting, Charney explicitly informed Willey that he wanted only Willey, not other OTBD staff, to attend subcommittee meetings.  In an email to Willey after the meeting, Scott Friedman noted that he "thought [Willey's] team did an excellent job today and I was delighted to be there to see it."

Willey emailed Mullinix after the meeting, noting that she was unhappy that Mullinix had spoken for 45-50 minutes of an hour long meeting, when her allotted time was 15-20 minutes.  Mullinix agreed that the presentation was too long.  Willey responded to Mullinix's email, stating "I believe you hijacked the presentation for your own self promotion."

In an email to Caryn Tiger-Paillex dated March 1, 2012, Willey noted that she had informed Ken Davis of her decision not to continue Mullinix's contract, but that she had not informed Charney, Friedman, or Bonnie Davis.  The email indicates that Willey, not Charney, decided not to renew Mullinix's contract, as Willey had yet to inform Charney of the decision.

On March 8, 2012, Willey informed Mullinix that Mount Sinai would not renew Mullinix's contract as OTBD Director upon expiration in July 2012 because Mullinix was not

sufficiently congenial with faculty.  At that time, Willey informed Mullinix that she would consider a continued role for Mullinix that would better leverage Mullinix's skills.

After a March 22 meeting with Charney, Willey stated that "after talking to [Charney] it is clear that I should take steps to end Kathy's engagement in the office now instead of having it play out through to the end of her contract."  A reasonable factfinder could read this email to state that Charney, not Willey, made the decision to immediately end Mullinix's engagement at Mount Sinai.  However, even assuming that Charney made that decision, there is no basis in the record from which a reasonable factfinder could find that his decision was made with discriminatory animus.  Mullinix argues that Charney decided to end Mullinix's engagement in the office was because of her age, but proffers no evidence of age discrimination regarding her termination.  She has not set forth evidence to demonstrate that Mount Sinai's proffered nondiscriminatory basis for her termination is a pretext and that her age was the real cause of her termination.  Accordingly, Mullinix's discrimination claim as to her termination is dismissed under the ADEA and NYSHRL.

As claims under the NYCHRL are examined "separately and independently from any federal and state law claims," even construing the NYCHRL "broadly in favor of [Mullinix], to the extent that such a construction is reasonably possible, the Court separately concludes that Mount Sinai is entitled to summary judgment on Mullinix's claim that her termination was based on discrimination.  See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013).  The record establishes that discrimination played no role in Mullinix's termination.  Mount Sinai contends that Mullinix's contract was not renewed because of interpersonal issues between Mullinix and Willey, faculty, and staff and because of her aggressive negotiation tactics.  Even assuming Charney made the decision not to continue

Mullinix's engagement with the office through July 2012, Mullinix has not pointed to any evidence which would indicate that his decision was a result of discrimination.  Charney's March 2011 comment related solely to the search for a new VP, OTBD and did not reflect discriminatory animus towards Mullinix's age with regard to her position as director.

III. <u>Breach of Contract Claim</u>

"Under New York law, an action for breach of contract requires proof of (1) a contract, (2) performance of the contract by one party, (3) breach by the other party, and (4) damages."  <u>First Investors Corp. v. Liberty Mutual Insurance Co.</u>, 152 F.3d 162 (2d Cir. 1998) (internal quotation marks and citation omitted).  "If an employee . . . is engaged to fill a particular position, any material change in his duties, or significant reduction in rank, may constitute a breach of his employment agreement."  <u>Rudman v. Cowles Communications, Inc.</u>, 30 N.Y.2d 1, 10 (N.Y. 1972); <u>see also</u> <u>Zeumer v. Fire Burglary Instruments, Inc.</u>, 210 A.D.2d 318, 319 (2d Dep't 1994); <u>Hondares v. TSS-Seedman's Stores</u>, 151 A.D.2d 411, 413 (1st Dep't 1989); <u>Yoon v. Fordham University Faculty and Administrative Retirement Plan</u>, 99-cv-11042 (RCC), 2004 WL 3019500, at *6 (S.D.N.Y. Dec. 29, 2004).

Mullinix claims that Mount Sinai breached her employment agreement by not paying her severance for six months after the date of termination.  She argues that because Mount Sinai had removed her from the position of director as director and none of the office reported to her as of March 22, 2012, Mount Sinai breached her employment contract.  Mullinix's contract provides, in relevant part, that Mullinix's "responsibilities are set forth in the attached Job Description."  (Plevan Decl. Ex. 17 at D00098.)  Mount Sinai did not provide the Court with the job description mentioned in the contract.  Without reviewing Mullinix's job description, the Court is unable to determine whether removal of Mullinix's duties as director was a material change to her duties, such that it would constitute a breach of the agreement.

- 34 -

Accordingly, the motion for summary judgment as to Mullinix's breach of contract claim is denied.

IV. <u>Motion to Seal</u>

The Court ordered the Clerk of Court to unseal certain documents filed under seal by the plaintiff, noting that the Court's order of November 30, 2013 precluded the parties from filing documents under seal without an accompanying motion and memorandum of law demonstrating that the sealing standards have been met.  <u>Lugosch v. Pyramid Co. of Onondaga</u>, 435 F.3d 110, 119-20 (2d Cir. 2006).  (Docket No. 37.)  Upon application by the parties, the Court ordered the Clerk of Court to seal certain documents pending further order of the Court.  (Docket No. 42.)  Mount Sinai contends that these exhibits contain private information regarding non-party candidates for the VP, OTBD position.  (Mair Decl., Exhibits 33-34, 36, 41-48, 51-52.)  Additionally, Mount Sinai seeks to seal Exhibit 22 to the Declaration of Bettina B. Plevan.

There is both a common-law and qualified First Amendment right of public access to judicial documents.  <u>Lugosch</u>, 435 F.3d 119-20.  "[D]ocuments used by parties moving for, or opposing, summary judgment should not remain under seal absent the most compelling reasons."  <u>Id.</u> at 123.  As a matter of law, documents submitted at summary judgment are judicial documents.  <u>Id.</u> at 121, 123.  "[T]he weight to be given the presumption of access must be governed by the role of the material at issue in the exercise of Article III judicial power and the resultant value of such information to those monitoring the federal courts."  <u>Id.</u> at 119.

Courts may weigh the presumption of disclosure against "countervailing factors," including "the privacy interests of those resisting disclosure."  <u>Id.</u> at 120 (quotation marks omitted).  Mount Sinai asserts that an evaluation of the documents weighs in favor of closure.  The documents in question include non-party candidates' resumes, interview schedules, contact information, and comments regarding the candidates' qualifications.

The Court concludes that the weight given to the presumption of access is less in this case because the limited quantity of confidential information does not go to the heart of the judicial process. The information is not central to the Court's rulings and has not required the Court to redact any portion of its Memorandum and Order. The presumption of access is overcome as to the narrowly-tailored confidential information at issue. The exhibits shall remain under seal and Mount Sinai may re-file Plevan Decl. Ex. 22 under seal. The grant of the parties' sealing request is without prejudice to the application of a non-party seeking to modify this order.

### CONCLUSION

For the reasons stated above, Mount Sinai's motion for summary judgment is granted in part and denied in part. Mount Sinai's motion to strike is denied. Mount Sinai's motion to seal is granted.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
      July 24, 2014